In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1635

HATTIE DIXON,

Plaintiff-Appellant,

v.

LARRY G. MASSANARI, Acting Commissioner
of the Social Security Administration,

Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 97 C 870--Patricia J. Gorence, Magistrate Judge.

Argued September 13, 2001--Decided November 8, 2001


   Before RIPPLE, ROVNER, and EVANS, Circuit
Judges.

   EVANS, Circuit Judge.  Hattie Dixon
received a belated 50th birthday present
on May 10, 1995. On that date, the
Commissioner of Social Security
determined, on Dixon's application, that
she was "disabled" as of her 50th
birthday (February 27, 1995) because then
her age, combined with her serious
medical condition, limited education,
absence of transferable work skills, and
ability to perform nothing more than
sedentary work, earned her supplemental
security income benefits under a medical-
vocational guideline. Prior to turning
50, Dixon's age was not a recognizable
factor in deciding whether she was
entitled to benefits, and Dixon has been
trying to get those benefits since 1990
when she stopped working. This case
focuses, then, on a narrow question: Does
substantial evidence support the
Commissioner's conclusion that she was
not disabled, as that term is defined by
law, between 1990 and the day she turned
50 in 1995.
   In the course of her long battle to
secure disability benefits, Dixon has had
three hearings before administrative law
judges (ALJs), two appeals to the Social
Security Appeals Council, and two reviews
by the district court. This is her first

visit to this court.

There is no question that Dixon is seriously ill. Dixon's claim that substantial evidence does not support the Social Security Commissioner's final decision that she was not disabled during the 5 years prior to her 50th birthday rests on three sub-issues. First, Dixon argues that, in conducting her third administrative hearing, Administrative Law Judge Patricia Kelly failed to reasonably evaluate the opinions of Dixon's physicians. Second, she argues that ALJ Kelly erred in concluding that Dixon could perform sedentary work as long as she was permitted to alternate between sitting and standing. Third, Dixon argues that the ALJ unreasonably concluded that Dixon could perform a significant number of jobs in the economy despite her impairments.

Dixon has a ninth-grade education and, before 1990, did some work as a bus driver and machine operator. She stopped working in October of 1990 when she developed pain in the left part of her stomach. In December 1990 Dixon first applied for disability insurance benefits and supplemental security income, alleging that she was disabled as of September 1990 due to a kidney infection and high blood pressure. The Social Security Administration denied Dixon's applications, and she began the review process.

Although ALJ Kelly's decision after Dixon's third administrative hearing is the key matter before us, that decision drew on earlier decisions, so all, where pertinent, will be discussed. At Dixon's first administrative hearing in October 1991, ALJ Ronald G. Bernoski considered testimony, from a vocational expert, that more than 10,000 sedentary, unskilled jobs existed in the Milwaukee area. After the hearing, in January 1992, Dr. Michael Dawson examined Dixon and noted complaints about her diabetes, high blood pressure, knee and back pain. He also assessed her ability to work, indicating that she could lift no more than 10 pounds, could neither stand nor walk for more than 1 hour in an 8-hour workday, and could not sit for more than 1 hours at a time.

ALJ Bernoski issued a decision on April

16, 1992, determining that Dixon was not disabled. In making this determination, Bernoski found that Dixon retained the residual functional capacity for the full range of sedentary work and that she could perform a significant number of jobs in the national economy. Bernoski's decision specifically rejected Dr. Dawson's assessment of Dixon's limited ability to work, noting that Dawson's physical examination did not reveal any significant abnormalities. The ALJ also noted that the exam results of Dixon's regular physicians failed to mention problems with her back or knees.

On August 6, 1992, the Appeals Council vacated the ALJ's decision and remanded, finding that Dixon's ability to work was limited to jobs that allowed her to alternate between sitting and standing. Dixon testified at a second administrative hearing before Bernoski in November 1992 and said she took Motrin for arthritis and insulin for diabetes. At that time, she also testified that she could stand for no more than 20 minutes at a time, but that she could "sit at a job" with little difficulty. A vocational expert testified that 9,200 jobs offering a sit/stand option existed in the Milwaukee area. Relying on this evidence, Bernoski issued a decision on December 23, 1992, again finding that Dixon was not disabled. The Appeals Council denied Dixon's request for review, and Bernoski's finding became the Commissioner's final decision. Dixon requested judicial review in the Eastern District of Wisconsin. On September 19, 1995, the district court remanded, determining that substantial evidence did not support the Commissioner's final decision that Dixon was not disabled./1

ALJ Patricia Kelly conducted a third hearing in September of 1996. Dixon testified that she "probably could" perform jobs, such as receptionist work, that require little lifting and offer a sit/stand option, as long as she was permitted to use the bathroom frequently, because when her condition acted up she had to answer the call of nature four or five times a day. On November 26, 1996, ALJ Kelly issued a decision finding that Dixon could perform sedentary work that provided a sit/stand option and that she was therefore not disabled between September 24, 1990 and February 27, 1995.

The Appeals Council found no basis for disturbing this decision.

Dixon once again sought judicial review. The parties filed cross-motions for summary judgment, and Magistrate Judge Patricia Gorence held that substantial evidence supported ALJ Kelly's decision. And that brings us here, on Dixon's appeal.

Dixon's medical problems began in 1990, when she was diagnosed with a kidney ailment. In February of that year, surgeons drained her kidney and inserted a temporary drainage stent. In October 1990, doctors diagnosed Dixon with a kidney infection and multiple abscesses, which they treated with antibiotics. They inserted a drainage tube in her left kidney on October 4, 1990, and later replaced it with a renal stent. In January 1991 Dixon's treating physician, Dr. John D. Silbar, reported that the drainage tube made it difficult for her to work. On February 15, 1991, Silbar stated that Dixon was "definitely disabled." Doctors removed the stent on March 5, 1991. In March and April 1991, Dixon complained of headaches and blurred vision. An eye exam revealed that glasses could correct her vision to 20/20.

Dixon's treating physician, Dr. Erika Voss, examined her on June 4, 1992, reporting that Dixon's high blood pressure was stable with medications but that her diabetes was poorly controlled. Voss noted that Dixon had not been complying with her diabetes treatment regimen. After Dixon continued to complain of blurred vision, headaches, and dizziness, in May 1992 she went to an eye clinic and a dietician. A July 1992 eye exam revealed no significant abnormalities.

Dixon continued to complain of knee pain in November 1992. X rays showed degenerative changes in both knees. That same month, Dixon's attorney prepared a questionnaire for Dr. Voss to complete. Voss reported that Dixon's complaints of frequent blurred vision, severe headaches, occasional dizziness, and frequent urination might all be related to elevated blood sugar. Voss wrote "yes" next to a statement indicating that she would expect Dixon to miss 20 or more days of work per year due to illness.

Dixon began taking insulin in December 1992. At that time, her blood pressure was normal. Subsequent treatment notes indicate that Dixon failed to appear for several medical appointments. On January 5, 1993, Dixon asked Voss for a letter of verification stating that she was unable to work, which Voss provided.

Orthopedic specialist Dr. Robert Jones examined Dixon in October 1993, noting that the range of motion in her right knee was 0 to 120 degrees. May 1994 knee X rays confirmed that Dixon had osteoarthritis in both knees. Voss prescribed a cane in June 1994. X rays taken in August 1994 revealed no changes from the May 1994 X rays. The radiologist who interpreted the X rays characterized Dixon's right knee as "normal" for an individual her age. Another orthopedic specialist examined Dixon in February 1995, noting that the range of motion in her right knee was 0 to 120 degrees and 0 to 140 in her left knee. The specialist advised Dixon to continue taking ibuprofen for her knee pain.

Dr. James D. Buck examined Dixon in December 1994 and reported that her right knee joint was "somewhat end stage" with "somewhat increased risk for undergoing knee replacement." He indicated that Dixon had controlled her diabetes and hypertension poorly.

In June 1996 Dixon underwent a third consultative examination. Dr. Daniel B. Jankins found that lumbar spine X rays showed minimal degenerative changes, and knee X rays showed no significant abnormalities. Jankins found that Dixon had a good range of motion in her back and no neurological deficits in her extremities. Dixon told Jankins that she could lift a gallon of milk and hold a cup of coffee without difficulty. Jankins opined that Dixon could lift up to 10 pounds and walk for up to 2 hours in a workday. He also stated that Dixon's impairments did not affect her ability to sit.

We review de novo the district court's grant of summary judgment. Schoenfeld v. Apfel, 237 F.3d 788, 792 (7th Cir. 2001). In reviewing the Commissioner of Social Security's final decision, we use the same deferential standard of review as the district court. See id. The Social

Security Act limits the scope of judicial review, providing that the agency's findings of fact are conclusive so long as substantial evidence supports them and no error of law occurred. See 42 U.S.C. sec. 405(g). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).

To determine disability, the ALJ makes a five-step inquiry:  (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national econ omy. See 20 C.F.R. sec. 404.1520; Zurawski, 245 F.3d at 885. Dixon's appeal focuses on steps four and five of this inquiry.

In making her decision, an ALJ must articulate, at some minimum level, her analysis of the evidence. See Zurawski, 245 F.3d at 888. She is not required to address every piece of evidence or testimony, but must provide some glimpse into her reasoning. See id. at 889. Where an ALJ denies benefits, she must build an accurate and logical bridge from the evidence to her conclusion. See id. at 887.

The first issue we address is whether ALJ Kelly reasonably evaluated the opinions of Dixon's physicians. Dixon ar gues that the ALJ improperly failed to give Dr. Voss' opinion controlling weight as that of a treating physician. A treating physician's opinion is entitled to controlling weight if it is well-supported by medical findings and not inconsistent with other substantial evidence in the record. See 20 C.F.R. sec. 404.1527(d)(2); Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000). Nonetheless, a claimant is not entitled to disability benefits simply because her physician states that she is "disabled" or unable to work. See Clifford, 277 F.3d at 870. The Commissioner, not a doctor selected by a patient to treat her, decides whether a claimant is disabled.

See id.; 20 C.F.R. sec. 404.1527(e)(1).

We must keep in mind the biases that a treating physician may bring to the disability evaluation. "The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." Stephens v. Heckler, 766 F.2d 284, 289 (7th Cir. 1985). Additionally, we have noted that the claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise. See id.

Here, ALJ Kelly decided not to give Voss' opinion controlling weight because she seriously doubted its credibility. We do not overturn an ALJ's credibility determinations unless they are "patently wrong." See id. at 887. ALJ Kelly determined that Voss was not completely objective--that she gave Dixon the benefit of the doubt whenever possible. For example, Voss termed Dixon's arthritis "very severe" and prescribed a cane, even though X rays failed to show any serious degenerative changes and orthopedic specialists noted that Dixon had a fairly good range of motion and muscle strength. Additionally, Voss accepted Dixon's complaints about blurred vision at face value, even though repeated opthalmology exams failed to show any significant abnormalities. Finally, ALJ Kelly questioned the validity of Voss' statement that Dixon would miss more than 20 days of work per year. As we just noted, Voss expressed this opinion by writing "yes" next to a question that Dixon's attorney had pre-typed. Voss did not elaborate on the basis for this opinion. Thus, because she supported it with substantial evidence, the ALJ was not patently wrong in determining that Voss' opinion was not, given all the other facts, entitled to controlling weight.

Dixon argues that in rejecting Voss' opinion, ALJ Kelly improperly substituted her own judgment for that of a medical professional. See Clifford, 227 F.3d at 870 (holding that an ALJ must not substitute her own judgment for a physician's opinion without relying on other medical evidence or authority in

the record); Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir. 1990) (warning that "judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor"). The cases in which we have reversed because an ALJ impermissibly "played doctor" are ones in which the ALJ failed to address relevant evidence. See Clifford, 227 F.3d at 870 (reversing because ALJ disregarded treating physician's opinion that the claimant had arthritis without citing any conflicting evidence in the record); Green v. Shalala, 51 F.3d 96, 101-02 (7th Cir. 1995) (reversing because ALJ, in denying child survivor benefits to son of man who had been missing for more than seven years, ignored death certificate issued by county court); Hayes v. Railroad Ret. Bd., 966 F.2d 298, 303 (7th Cir. 1992) (reversing because ALJ disregarded "overwhelming corroborating medical evidence" of claimant's disability). Here, ALJ Kelly thoroughly discussed the medical evidence in making her decision: she did not, as Dixon suggests, play doctor.

Dixon also argues that ALJ Kelly erred by failing to accept Dr. Dawson's consultative opinion. Although Kelly did not specifically address Dr. Dawson's opinion, she incorporated by reference ALJ Bernoski's discussions of the medical evidence. Bernoski rejected Dawson's opinion because objective evidence did not support it. Specifically, Bernoski noted that Dawson's musculoskeletal exam failed to show significant abnormalities and that the exam results of Dixon's regular physicians did not mention problems with her back or knees. Bernoski also determined that Dawson based his assessment of Dixon's limited ability to work on her own statements, and not on objective findings. An ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations. See Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995). In rejecting Dawson's assessment, Bernoski noted that he gave greater weight to the opinions of Dr. Harry Kanin, who treated Dixon for hypertension, diabetes, and back problems, and Dr. John D. Silbar, who treated Dixon for kidney infections. When treating and consulting physicians

present conflicting evidence, the ALJ may decide whom to believe, so long as substantial evidence supports that decision. See Books v. Chater, 91 F.3d 972, 979 (7th Cir. 1996). Kanin's opinion placed no restrictions on Dixon's ability to perform sedentary work. Although Silbar stated that Dixon was disabled in January 1991, Bernoski determined that Silbar based this opinion primarily on the presence of the renal stent, which limited her ability to work. Once doctors removed the stent in early 1991, Bernoski noted that it no longer limited Dixon's ability to work. Therefore, because ALJs Kelly and Bernoski thoroughly discussed the evidence, we will not overturn their decisions to accept and reject certain medical opinions.

We next consider whether ALJ Kelly reasonably concluded that Dixon could perform sedentary work with a sit/ stand option. Residual functional capacity (RFC) is an administrative assessment of what work-related activities an individual can perform despite her limitations. See SSR 96-8p, 61 Fed. Reg. 34474, 34475 (1996); 20 C.F.R. sec. 404.1545(a). Here, ALJ Kelly determined that Dixon retained the ability to perform sedentary work that allowed her to alternate between sitting and standing. Sedentary work involves lifting no more than 10 pounds and occasional walking and standing. See 20 C.F.R. sec. 404.1567(a). In assessing the claimant's RFC, the ALJ must consider both the medical and nonmedical evidence in the record. See 20 C.F.R. sec. 404.1545.

Here, ALJ Kelly thoroughly reviewed the medical and nonmedical evidence. In arriving at her conclusion, ALJ Kelly relied on Dixon's own statement at the 1996 hearing that she could perform receptionist work so long as she was able to take frequent bathroom breaks. Kelly also noted that X rays failed to show any serious degenerative changes in Dixon's knees and that orthopedic specialists who examined Dixon noted a fairly good range of motion and muscle strength. Additionally, she also noted that Dixon did not take strong pain medications and that her visits to physicians were only intermittent. She also noted that Dr. Voss never referred Dixon to a diabetes specialist.

Kelly also found that Dixon's statements about her functional limitations were not credible. Because the ALJ is in the best position to observe witnesses, we will not disturb her credibility determinations as long as they find some support in the record. See Herron v. Shalala, 19 F.3d 329, 335 (7th Cir. 1994). Kelly noted that Dixon's statements about her symptoms were "vague" and "ephemeral." Although Dixon complained of blurred vision, repeated opthalmological exams revealed no serious abnormalities. Additionally, Kelly noted that although Dixon had elevated blood sugar levels, she did not always comply with dietary recommendations and that her visits to physicians were "intermittent at best." Therefore, Kelly could have reasonably determined that Dixon's testimony was not credible.

As Dixon noted, Kelly did not specifically address how Dixon's need for frequent bathroom breaks would impact her ability to work. The Commissioner argues that Dixon waived appeal of this issue by failing to address it before the district court. Dixon argues that Voss' overall opinion "encompassed the need to frequently urinate," and that because she argued to the district court that ALJ Kelly should have accepted Voss' opinion, she preserved the urinary frequency issue for review. Dixon's argument is unpersuasive. Voss' opinion did not address how Dixon's urinary frequency would affect her ability to work. It merely stated that Dixon's complaints of urinary frequency, as well as some of her other complaints, may be related to diabetes.

Even assuming that Dixon preserved this issue for review, ALJ Kelly did not err. Kelly relied on Dixon's own testimony that she could perform receptionist work as long as she could take frequent bathroom breaks. She also noted that most of Dixon's complaints of urinary frequency pre-dated her diagnosis of diabetes and appeared to be due to urinary tract infections, which Dixon's doctors successfully controlled.

Finally, we must determine whether the ALJ reasonably concluded that Dixon could perform a significant number of jobs in the economy despite her impairments. In making this determination, Kelly considered the testimony of vocational

expert Beth A. Hoynik. Hoynik testified that there were 25,000 jobs in the regional economy available to a hypothetical individual aged 45 to 50 years old with a ninth-grade education, unskilled work experience, and the ability to perform sedentary work with a sit/stand option. Hoynik testified that 12,500 jobs would remain available to an individual also suffering from occasional blurred vision, and that 7,500 jobs would be available to someone with frequent blurred vision.

Dixon argues that the ALJ failed to consider that Dixon's need to take frequent sick days would impair her ability to remain employed. Hoynik testified that most employers would tolerate 2 missed days of work per month, but not 3. ALJ Kelly noted that 2 absences per month works out to about 20 absences per year. Therefore, substantial evidence supported Kelly's determination that Dixon could perform a significant number of jobs in the economy.

Because the ALJ carefully reviewed Dixon's case and supported her decision with substantial evidence, we affirm the district court's grant of summary judgment.

FOOTNOTE

/1 While her district court action was pending, Dixon reapplied for supplemental security income. On May 10, 1995, the agency determined that she was disabled under the Commissioner's medical-vocational guidelines as of February 27, 1995, her 50th birthday. The guidelines provide that a claimant who is 50 years old and has a limited education and no transferable skills is disabled if she is limited to sedentary work. See 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.10. Given this award, Dixon's current appeal, as we noted up front, focuses only on the period between the alleged onset date of her disability, September 24, 1990, and February 27, 1995, when she turned 50 years of age.