**Sherifa L. HIGGINS, Plaintiff–Appellant,**

v.

**Jo Anne BARNHART, Defendant–Appellee.**

No. 02–1517.

United States Court of Appeals, Seventh Circuit.

Argued July 10, 2002.

Decided July 24, 2002.

Before COFFEY, KANNE, and ROVNER, Circuit Judges.

ORDER

Sherifa Higgins applied for Supplemental Security Income and Disability Insur-

ance Benefits pursuant to Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(1), 423, 1382(c), claiming that the combination of mild mental retardation, obesity, and recurring ankle pain made it impossible for her to work from 1991 to 1994. The Social Security Administration ("SSA") denied her application, and Higgins sought judicial review, arguing that the decision of the administrative law judge was not supported by substantial evidence. The district court affirmed the SSA's determination that Higgins was not entitled to disability benefits, and we affirm the judgment of the district court.

## I.  Background

Sherifa Higgins is a mildly retarded woman who graduated from a high school special education program in 1989. Since 1991 Higgins has lived on her own or with roommates, but she remains functionally illiterate and incapable of performing basic math or managing her own funds. In 1984, at the age of 12, Higgins took an intelligence test and registered an IQ of 65. Higgins, though, scored only 56 when she was retested in 1987.

In 1989 Higgins received vocational counseling from Goodwill Industries, undergoing a three-week vocational evaluation that included an Adult Basic Education test ("ABE"). The ABE revealed that Higgins read and performed arithmetic at a third-grade level. But Goodwill observed that Higgins paid attention to her tasks, was able to follow three- and four-step sets of instructions, exhibited common sense, and had good social skills. Goodwill found that Higgins had "potential with training," and recommended that she enter a twelve-week training program in food services.

Higgins worked at Ryan's Steak House for six months in 1991 and as a counselor at Happy Hollow Camp in the summer of 1992. Beginning in 1994, Higgins held jobs as a food service worker, housekeeper, ticket-taker, and laundry worker. Higgins does not dispute that she has engaged in substantial gainful activity since January 1994.

An orthopedist diagnosed Higgins as having occasional mild Achilles tendonitis in 1990. Higgins subsequently sought treatment for foot pain three times between 1991 and 1994. In January 1991 Higgins consulted a physician at the Metro Health Clinic about pain in her left ankle. The physician recommended exercise therapy. Higgins returned to the clinic four months later complaining of foot pain, but her physician observed no swelling or tenderness, and x-rays of Higgins's foot were normal. Higgins was directed to take Motrin, an over-the-counter pain reliever, and was referred to physical therapy. In July 1991 Higgins twisted her ankle and returned to the clinic where she was diagnosed as having a "Grade I inversion injury." Higgins's x-rays were normal except for a "tiny plantar calcaneal bone spur," and her physician prescribed naprosyn and an elastic ankle wrap. Higgins sprained her ankle in February 1992 and was again prescribed naprosyn and advised to do ankle exercises. During the period when Higgins experienced difficulty with her ankle, she also suffered from obesity, weighing, at five-foot six inches tall, as much as 218 pounds when she visited the clinic for her sprained ankle.

Higgins did not seek treatment for her ankle again until after 1994, when the time period relevant to her benefits claim had already ended. She was diagnosed with bursitis in June 1996, a sprained ankle in October 1996, and plantar fasciitis and calcaneal spurs in February 1998. Higgins also sought treatment for chest pain in November 1995, lower back pain in Febru-

ary and September 1996, and hip pain in 1996.

Higgins filed her initial applications for disability benefits in 1992. At the request of the Disability Determination Office, Higgins saw Dr. Jerome Modlik, who administered a new round of intelligence testing that placed her IQ at 66. Higgins was later evaluated by two different psychologists, Dr. Dan Wych and Dr. James Gange, to determine her residual functional capacity. Dr. Wych found that Higgins's mental handicap did not restrict her in daily living activities and only moderately limited her social functioning. Dr. Wych further found that Higgins seldom suffered deficiencies of concentration, persistence, or pace that would prevent her from completing tasks on time, and that she never suffered from periods of deterioration or decompensation. Dr. Gange, on the other hand, judged Higgins to be slightly restricted in daily activities but not limited at all in her social functioning. Dr. Gange agreed with Dr. Wych that Higgins never suffered periods of deterioration or decompensation, but opined that she often suffered deficiencies of concentration, persistence, or pace. According to Dr. Gange, however, these deficiencies would not prevent Higgins from independently completing simple, repetitive tasks. Both Dr. Wych and Dr. Gange rated Higgins as moderately limited in her ability to carry out detailed instructions and in her ability to accept instructions and respond appropriately to criticism from supervisors.

Higgins's applications for benefits were denied. She refiled her applications in 1993, and they were again denied. Higgins requested a hearing before an ALJ, who found that Higgins was not entitled to disability benefits because she was not severely impaired. The Appeals Council vacated the ALJ's decision and remanded the case for another hearing. The ALJ again denied the applications, finding that Higgins was engaging in substantial gainful activity, and the Appeals Council again vacated and remanded.

At the third hearing, Higgins testified that she was unable to work between 1991 to 1994 because of ankle pain, but that she could shop and perform household chores. The ALJ found that Higgins's mental handicap, by itself and in combination with her obesity and foot pain, was not severe enough to qualify her for benefits. The ALJ further concluded that Higgins could perform "unskilled work consisting of simple, repetitive tasks, not requiring attention for more than two hours at a time and not requiring reading, writing, or math." Relying on the testimony of vocational expert Gail Ditmore, the ALJ found that over 33,000 such positions existed in the national economy. Accordingly, the ALJ denied Higgins's applications, and this time the Appeals Council affirmed.

## II. Analysis

In reaching his conclusion that Higgins was not entitled to disability benefits, the ALJ followed the five-step analysis detailed in 20 C.F.R. § 404.1520 and 20 C.F.R. § 416.920. The ALJ was satisfied at Step 1 that Higgins had not engaged in substantial gainful activity during the relevant period from 1991 to 1994. The ALJ further found that Higgins's mental retardation was a "severe impairment" for the purposes of Step 2. But at Step 3 the ALJ concluded that Higgins's mental retardation, by itself and in combination with her obesity and ankle pain, did not meet or equal in severity one of the impairments listed in the regulations. Step 4 requires the ALJ to determine if a claimant has the residual functional capacity to return to her former occupation. Higgins however had no relevant work experience prior to the period for which she sought benefits.

The ALJ therefore proceeded to Step 5 to determine if jobs that Higgins could have performed existed in significant numbers in the national economy between 1991 and 1994. Based on the testimony of a vocational expert, the ALJ concluded that Higgins could have performed work at the unskilled, medium exertional level and that a significant number of job opportunities, about 33,000, were then available to her.

We will affirm the ALJ's factual findings, as long as they are supported by substantial evidence and are not the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir.2001). Substantial evidence is evidence that a reasonable mind could accept as adequate to support the ALJ's conclusion. *Id.* The ALJ must build "a bridge from the evidence to his conclusion," *Green v. Apfel,* 204 F.3d 780, 781 (7th Cir.2000), but need not address every piece of evidence or testimony in his decision, *Diaz v. Chater,* 55 F.3d 300, 308 (7th Cir.1995). We will not reweigh the evidence or substitute our own judgment for that of the ALJ. *Godbey v. Apfel,* 238 F.3d 803, 807 (7th Cir.2000).

A. Step 3 Determination

■ Higgins does not challenge the ALJ's Step 1 and 2 findings. But she contends that the ALJ committed legal error at Step 3 by misinterpreting and misapplying § 12.05C of the Listing of Impairments. Appellant's Br. at 11–12. In 1992 Higgins registered an IQ of 66; under § 12.05C Higgins would thus automatically qualify for benefits if, on top of her mental retardation, she suffered from "a physical or other mental impairment imposing an additional and significant work-related limitation of function." The ALJ concluded however that her mental handicap, in combination with her obesity and ankle pain, did not meet the threshold set by § 12.05C:

At step three, I find that the claimant's impairments individually and in combination do not meet or equal any listings. In addition, all of the impairments have been considered both individually and in combination throughout the five step evaluation process. I note that with a finding of mental retardation, the claimant would meet Listing 12.05 C with the addition of another impairment or combination of impairments imposing significant work related limitations. I have considered this issue and determined that all of the *nonsevere impairments* do not cause additional limitations.

ALJ's Order at 5 (emphasis added). Higgins zeroes in on the ALJ's use of the term "nonsevere" to describe her physical ailments, arguing that he confused the "severe" standard at Step 2 with the "additional and significant work-related limitation of function" standard under § 12.05C. Appellant's Br. at 12. According to Higgins, the ALJ concluded that he could not consider her obesity and ankle pain under § 12.05C because they were "nonsevere." Higgins contends, however, that "additional and significant" means something less than "severe." *Id.*

This circuit has not explicitly addressed the meaning of "additional and significant work-related limitation of function" under § 12.05C in relation to the Step 2 "severe" standard. The SSA argues that an "additional and significant" limitation is by definition "severe." Appellee's Br. at 16. The district court agreed with Higgins that "additional and significant" means something less than "severe," a view supported by decisions in other circuits. *See, e.g., Sird v. Chater,* 105 F.3d 401, 403 (8th Cir.1997) ("... [T]he second prong of § 12.05C is met when the claimant has a physical or additional mental impairment that has a 'more than slight or minimal'

effect on his ability to perform work."); *Nieves v. Sec'y of Health & Human Servs.,* 775 F.2d 12, 14 (1st Cir.1985) ("An impairment imposes significant limitations when its effect on a claimant's ability to perform basic work activities is more than slight or minimal."); *Edwards v. Heckler,* 755 F.2d 1513, 1515 (11th Cir.1985) ("That 'significant' involves something more than 'minimal' but less than 'severe' follows from the regulations."). But we afford substantial deference to an agency's interpretations of its own regulations, *Rhodes v. Brown,* 153 F.3d 785, 789 (7th Cir.1998), and the newly revised § 12.00A, which provides guidance for evaluating mental disorders, equates "additional and significant" with "severe".

For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a *"severe"* impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are *"severe"*..., *we will not find that the additional impairment(s) imposes* "an additional and significant work-related limitation of function ...."

20 C.F.R. Part 404, Subpart P, Appendix, § 12.00A (emphasis added).

But even if an "additional and significant" impairment need not be "severe," Higgins fails to establish that the ALJ made an error of law in applying § 12.05C. Higgins misreads the ALJ's statement that "all of the nonsevere impairments do not cause additional limitations"; as the district court noted, the ALJ does not state that Higgins's physical impairments fail to satisfy the requirements of § 12.05C *because* they are nonsevere. Read literally, and in the context of the ALJ's assertion that he has considered all of Higgins's impairments "individually and in combination throughout the five step evaluation process," the ALJ's statement says only that Higgins's physical impairments are not severe *and* they do not satisfy § 12.05C.

Higgins next claims that the ALJ's Step 3 determination is not supported by substantial evidence. Appellant's Br. at 13. She argues that the ALJ ignored psychological testing that showed her to be mildly retarded, functionally illiterate, mathematically incompetent, and socially immature. *Id.* In particular, Higgins complains that the ALJ made no mention of her recorded IQ of 56 in 1987. *Id.* But the ALJ must have considered the testing data that revealed Higgins's mild retardation and associated problems. If he had not, he would not have concluded at Step 2 that Higgins was mentally handicapped and thus severely impaired, and he would not have proceeded in Step 3 to evaluate Higgins's impairments under § 12.05C.

The ALJ relied on Higgins's 1992 IQ of 66, not her 1987 IQ of 56, when evaluating her mental impairment. Had the ALJ used the 1987 test that placed Higgins's IQ below 60 rather than the 1992 test that placed her IQ between 60 and 70, Higgins would have automatically qualified for disability benefits under § 12.05B. But because Higgins was younger than 16 when she took the 1987 IQ test, the results were diagnostically valid only for two years, until 1989. *See* 20 C.F.R. Part 404, Subpart P, Appendix, § 112.00D. Moreover, Higgins does not argue that the ALJ erred in evaluating her case under § 12.05C rather than § 12.05B, so the 1987 IQ score is irrelevant.

Higgins further contends that the ALJ misstated evidence from the psychological evaluations administered by Drs. Modlik, Wych, and Gange. Appellant's Br. at 14–15. First, Higgins claims that the ALJ ignored Dr. Modlik's finding that she could

not do basic math or manage her own funds. *Id.* at 14. But the ALJ specifically directed the vocational expert to limit her estimate of the number of jobs available to Higgins to those that did not involve math; in doing so, the ALJ implicitly acknowledged the evidence that Higgins had poor mathematical skills. Higgins next claims that the ALJ ignored Dr. Wych's findings that she was moderately limited in her ability to accept instructions and respond to criticism and in her social functioning, and Dr. Gange's findings that she often had deficiencies of concentration, persistence, or pace. *Id.* at 14–15. But the Psychiatric Review Technique Form submitted with the ALJ's written decision rates Higgins as slightly restricted in daily living activities, and often deficient in concentration, persistence, or pace. Moreover, the limitations noted by all three doctors were symptomatic of Higgins's mental retardation, not of another, additional disorder. And again the ALJ implicitly considered and accepted this evidence by classifying Higgins as severely impaired at Step 2. The ALJ's Step 3 conclusion that Higgins was not impaired to the level required by § 12.05C is completely consistent with his Step 2 finding which was based, in part, on the doctors' reports.

Higgins also argues that the ALJ misconstrued the results of the vocational assessment she underwent at Goodwill Industries. *Id.* at 13. The ALJ recounts Goodwill's belief that Higgins possessed good interpersonal skills and was capable of improvement with practice, but she insists the report proves her inability to work because it recommends training and placement assistance to prepare her for "competitive employment." *Id.* Goodwill's report is positive, however, about Higgins's ability to work, noting for example her good "task attention" and her ability to follow 3 and 4 step sets of instructions.

Higgins further submits that the ALJ ignored evidence of the physical limitations imposed by her obesity, as well as the severity and persistence of her ankle pain. *Id.* at 13–14. But Higgins did not present any testimony or other evidence at her hearing that her obesity significantly impaired her ability to work. Rather she testified that her ankle pain was the only physical ailment that made it difficult for her to work between 1991 and 1994. And the ALJ's decision specifically mentions Higgins's visits to the MetroHealth Clinic in July 1991 for a twisted ankle and February 1992 for an ankle sprain, as well as the x-ray that showed a tiny plantar calcaneal bone spur.

The ALJ acknowledges that Higgins was treated with pain medication and advised to undergo physical therapy. According to the ALJ, however, these incidents did not suffice to "show significant treatment or complaints of significantly limiting physical impairments" during the time period relevant to Higgins's alleged disability. Higgins sought medical treatment for her ankle pain only three times between 1991 and 1994. In each instance her physician diagnosed her problems as minor (mild tendonitis, a twisted ankle, a sprained ankle) and treated her on an outpatient basis with pain medication. Higgins testified that her ankle pain prevented her from working, but the ALJ discredited this testimony, and this court treats an ALJ's credibility findings with great deference. *See Pope v. Shalala*, 998 F.2d 473, 487 (7th Cir.1993). The record provides sufficient support for the ALJ's conclusion that Higgins's ankle pain was not a significantly limiting physical impairment.

Higgins complains that the ALJ ignored the obesity-related chest pain that she suffered in 1996 and the bursitis and other foot pain that she experienced from 1996

to 1998. *Id.* at 15. But both years are outside the period for which Higgins is seeking benefits, and her medical complaints from those years are irrelevant.

Higgins cites to *Rohan v. Chater,* 98 F.3d 966, 970–71 (7th Cir.1996), to suggest that, in dismissing her physical ailments, the ALJ substituted his layman opinion for that of her physicians. Appellant's Br. at 17. But Higgins's case is easily distinguishable from *Rohan.* In *Rohan,* the ALJ ignored a medical finding that the claimant had a significant, ongoing problem with depression. *Rohan,* 98 F.3d at 970–71. In contrast, no physician made a medical finding during the relevant time period that Higgins's ankle pain or obesity constituted a substantial, ongoing problem.

Finally, Higgins submits that the ALJ concluded erroneously that her participation in substantial gainful activity after 1994 established that she was not severely impaired before 1994. *Id.* at 14. The ALJ reached no such conclusion. In evaluating Step 4, the ALJ viewed Higgins's successful work history after January 1994 as "strong evidence" of her ability to engage in substantial gainful activity between 1991 and 1994. But he nonetheless proceeded to Step 5 and considered the testimony of the vocational expert before determining whether Higgins was capable of working.

B. Step 5 Determination

■ Higgins also challenges the ALJ's Step 5 decision that she was not disabled and therefore not entitled to benefits. *Id.* at 21–22. The ALJ found that Higgins could perform unskilled, repetitive work and considered the vocational expert's testimony that about 33,000 jobs were available to an individual of Higgins's age, education, and vocational background, who had no physical limitations. The ALJ directed the vocational expert to assume in calculating this number that Higgins could perform only simple, repetitive tasks that did not require reading, writing, or math, and that she could pay attention to a task for no more than two hours.

Higgins's challenge to the ALJ's Step 5 determination is based on the vocational expert's response to a hypothetical presented by her attorney. *Id.* at 22. Higgins's attorney asked the vocational expert to assume that, in addition to the limitations specified by the ALJ, Higgins also often failed to complete tasks in a timely manner. The vocational expert testified that an individual who could not complete tasks would be unable to work.

Higgins's attorney based this hypothetical on Dr. Gange's finding that Higgins "often" suffered deficiencies of concentration, persistence, or pace that would result in failure to complete tasks in a timely manner. But Dr. Gange also concluded that Higgins was only "moderately" limited in her ability to complete tasks in a timely manner, and observed that Higgins retained the ability to perform simple repetitive tasks. Furthermore, Dr. Wych found that Higgins "seldom" had difficulty completing tasks in a timely manner. We will not substitute our own judgment for the ALJ's when two plausible conclusions can be drawn from the same evidence. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir.2000). The ALJ's determination that Higgins could complete simple, repetitive tasks was supported by substantial evidence, and the hypothetical that Higgins' attorney posed to the vocational expert was therefore irrelevant to the question of how many jobs were available to Higgins.

AFFIRMED.