NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued June 9, 2009
Decided August 14, 2009

**Before**

WILLIAM J. BAUER, *Circuit Judge*

RICHARD A. POSNER, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 08-3800

| | |
|---|---|
| CARMELLA LABONNE, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Western District of |
| | Wisconsin. |
| *v.* | |
| | No. 07-cv-727-bbc |
| MICHAEL J. ASTRUE, | |
| Commissioner of Social Security, | Barbara B. Crabb, |
| *Defendant-Appellee.* | *Chief Judge.* |

**ORDER**

Carmella Labonne applied for disability insurance benefits, claiming that since May 2004 her ability to work was limited by congestive heart failure, back and neck pain, breast cancer, and panic disorder. The administrative law judge found that Labonne was not disabled between May 2004 and September 2006 (the date of her 50th birthday), but that she became disabled after September 2006 upon entering a new age classification. In a thorough 27-page order, the district court upheld the ALJ's determination. On appeal Labonne challenges the ALJ's decision that she was not disabled for the 28 months between May 2004 and September 2006. Her principal arguments are that the ALJ did not give

sufficient weight to the functional evaluations made by her treating physician and her treating nurse, and that the ALJ unreasonably discredited her account of her functional limitations. We affirm.

Labonne was born in 1956 and has a tenth-grade education. She was treated for various heart ailments throughout the 1990s. She also had breast cancer, undergoing rounds of chemotherapy and radiation between the removal of a lump in 1997 and then the breast in 2001. In 2001 she also had a cervical fusion of her neck.

In October 2003 Labonne was diagnosed with frequent tachycardia, or rapid heart-beat, STEDMAN'S MEDICAL DICTIONARY 1931 (28th ed. 2006), and anxiety disorder. The following month Dr. Imran Niazi, Labonne's cardiologist since 1996, reassured her that her heart was healthy. In April 2004 a family physician prescribed medication for Labonne's anxiety and the next month the physician reported that it was in remission.

In September 2004 Dr. Niazi noted that Labonne's heartbeat continued to race approximately three times a month and speculated that she had moderate cardiomegaly, as well as prominent pericardial effusion (that is, fluid was escaping from the tissue surrounding her heart, STEDMAN'S MEDICAL DICTIONARY at 616, 1457), but he recommended no treatment if she had a normal ejection fraction (that is, if her heart expelled a normal amount of blood during contraction, *see* id. at 769).

Labonne first sought treatment for back and neck pain in November 2004. A neurosurgeon found that an MRI of her cervical spine was for the most part unremarkable and opined that her back pain was caused by "decreased disk space height and hydration" and that her neck pain was "due to muscular strain." He recommended she use a brace, stretch daily, and exercise.

In January 2005 Labonne consulted Dr. Maciolek, a rheumatologist, who reported that CT scans revealed premature lumbar and cervical degenerative disease. He noted, among other things, that her extremities were of normal strength, and that her spine contour, grip, joints, and reflexes were all normal. He recommended that she take a muscle relaxant and move regularly. Dr. Maciolek noted that Labonne would likely be incapable of doing most of the work available to someone with a tenth-grade education, including sedentary work, because she would have to move frequently to alleviate pain.

Also in April Labonne complained of a cold and was seen for the first time by Nurse Nancy Asencio, who thereafter began coordinating her care. At that visit, Labonne told Asencio that her October 2004 EKG was normal.

In September 2005 Labonne saw Dr. Niazi after a CT scan in connection with follow-up for her breast cancer revealed pericardial effusion. Based on her complaints of early satiety and "bloating," Dr. Niazi suspected that symptoms of heart failure may have manifested as early as February 2005. He performed an EKG and found, additionally, an ejection fraction of approximately 30 to 35% (the normal is 55% or greater, *see* STEDMAN'S MEDICAL DICTIONARY at 769), and an enlarged heart. Labonne was diagnosed with atrial flutter and heart failure, and in September she underwent flutter ablation and had a biventrical defibrillator/pacemaker implanted. A few days later she applied for federal disability insurance benefits, asserting that she had been unable to work since May 2004.

In November 2005 a state-agency physician completed a functional-capacity assessment in which he concluded, after reviewing the medical record, that Labonne could frequently carry light objects, sit and stand for extended periods, and occasionally climb stairs, stoop, kneel, crouch, and crawl. The physician disagreed with Dr. Maciolek's opinion that Labonne could not work in a sedentary capacity given Dr. Maciolek's observations that she had normal gait, strength in her extremities, and reflexes.

In February 2006 Dr. Niazi completed a functional-capacity questionnaire in which he identified Labonne's symptoms as shortness of breath, fatigue, weakness, nausea, palpitations, and dizziness. He ticked off the side effects of Labonne's twelve prescribed medications as including frequent urination, muscle weakness, and fatigue. He opined, among other things, that her cardiac condition would interfere with her attention and concentration; that she could walk only less than a mile without pain; that she could stand and sit for only short periods, and that her legs would need to be elevated to heart level for most of the time that she sat. Dr. Niazi concluded that Labonne was incapable of performing even low stress jobs. But he did not respond to a question asking him to identify the onset date of her symptoms and limitations.

Also in March 2006 Nurse Asencio completed a functional capacity-questionnaire in which she reported Labonne's symptoms: persistent arrythmias; fatigue; shortness of breath; and persistent, crushing back pain that could be exacerbated by daily activities and alleviated only by Vicodin and frequent bed rest. The Vicodin and her anxiety medications caused drowsiness, and her cardiac medications caused frequent urination. Labonne could not undergo surgery because of her "cardiac status," and she could not walk a block without rest, stand for 15 minutes without a significant increase in pain, nor extend her arms without pain.

In September 2006, upon a request from Labonne's attorney, Dr. Niazi submitted a new copy of the functional-capacity questionnaire in which he identified February 22, 2005, as the earliest date of Labonne's symptoms and limitations. But in another form that

Dr. Niazi submitted later that month, he moved up the disability onset date—without explanation—to May 15, 2004.

In October 2006 an EKG revealed that Labonne's ejection fraction was 55%; that her left ventrical was of normal size and systolic function; and that her right ventricle was probably of normal size.

At the hearing Labonne testified to the following. She stopped working at her brother's restaurant in May 2004, and her symptoms forced her to stop working altogether three months later. On a typical day she did some light child care or household chores, but fatigue forced her to return to bed repeatedly. Her degenerative disk disease caused back and leg pain, which prevented her from sitting for more than short periods; she walked, at most, just to the mailbox and back. Depressed since her breast cancer diagnosis, she also suffered sporadic bouts of anxiety and side effects from her medications including dizziness and drowsiness. She drove two or three times a week to her daughter's school, shopped for groceries with her husband, and sometimes cooked.

The ALJ asked a vocational expert about the jobs available to an individual who could, among other things, do light work; occasionally climb, stoop, bend, crouch, crawl, or kneel; stand or sit for no more than 30 minutes at a time; and had satisfactory if limited ability to maintain attention and concentration and deal with work stresses. The VE answered that there were about 18,000 jobs available in Wisconsin for someone with those limitations, including file clerk, information clerk, and procurement clerk. The VE added, however, that no jobs were available to an individual who had to lie down at unscheduled intervals.

The ALJ evaluated Labonne's disability claim using the standard five-step analysis required by the applicable regulations. *See* 20 C.F.R. §§ 404.1520, 416.920. Overall the ALJ determined that Labonne became disabled as of September 25, 2006, because she attained a new age classification but that she was not disabled before that date. The ALJ determined at step two that Labonne had not engaged in substantial activity since May 15, 2004. At step three the ALJ determined that Labonne's cancer was not a severe impairment because it had not recurred. He classified her back impairment and cardiomyopathy as severe, although he noted that her lumbar disc disease was only mild, as suggested by scans from November 2004, and that her cardiomyopathy had not yet been documented (it would not be documented until late 2005). At step four the ALJ determined that Labonne's severe impairments did not qualify as one of the presumptively disabling illnesses listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

At step five the ALJ agreed with the state-agency physicians that Labonne could perform sedentary work. The ALJ noted that Labonne testified that she did light

housework and child care and that she attributed her fatigue and shortness of breath to congestive heart failure. The ALJ found incredible Labonne's testimony concerning the intensity, persistence, and limiting effects of her illnesses given the results of the October 2006 cardiac evaluation, which suggested that her cardiomyopathy had improved. And the ALJ doubted that Labonne's anxiety and depression seriously impaired her functioning because she had never received significant treatment for a mental condition.

The ALJ also questioned the accuracy of evaluations made by Labonne's treating sources. He doubted Nurse Asencio's assessment regarding Labonne's back impairments absent documentation of a severe spinal condition, frequent complaints of back pain, and epidural injections or other significant treatments. The ALJ also was skeptical of Dr. Niazi's assessment, which he suspected was compromised by sympathy for Labonne's claim. The ALJ noted that on the functional-capacity questionnaire, Dr. Niazi amended—without explanation—Labonne's onset date of disability to May 2004, even though her cardiomyopathy was not diagnosed until late 2005.

The Appeals Council denied Labonne's request for review. The district court upheld the ALJ's decision. It determined that the ALJ reasonably concluded that Dr. Niazi's decision to change the disability onset date to May 2004 undermined his credibility. It agreed that Nurse Asencio's opinion was entitled to little weight because the medical evidence was inconsistent with her assessment. Similarly the district court found Labonne incredible because the improvement in her heart condition and the mild treatment she received for her intermittent complaints of back pain were not consistent with her testimony concerning the severity of her symptoms. And while the district court noted that the ALJ did not discuss the side effects of Labonne's medication, it concluded that the error was harmless because, among other things, while the potential side effects of the medication could be extreme, Labonne admitted that she was only mildly affected by secondary effects of her medication (for example, she testified that she was able to drive her child to school). The ALJ also appeared to have accommodated the potential medication side effects by restricting her exposure to hazards such as dangerous machinery and heights.

We uphold an ALJ's denial of disability unless the decision is not supported by substantial evidence or is based on an error of law. 42 U.S.C. § 405(g); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007); *Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004). Substantial evidence exists if a reasonable person could conclude there is enough evidence to support the decision. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Rice*, 382 F.3d at 369.

On appeal Labonne first contends that the ALJ's decision was unsupported by substantial evidence because he credited the opinions of the state-agency doctor, who

determined that she could do sedentary work, over those of Dr. Niazi, who said she could not. She insists that Dr. Niazi's long relationship with her and his specialty in cardiology should have compelled the ALJ to favor Dr. Niazi's opinion over the state-agency physician, who never examined her and whose specialty was not identified.

An ALJ must identify a flaw in the treating physician's analysis before rejecting it for the opinion of a state-agency doctor. *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). But an ALJ may reject a treating physician's opinion over doubts about the physician's impartiality, particularly since treating physicians can be overly sympathetic to their patients' disability claims. *See Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir. 2006); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). We uphold all but the most patently erroneous assessments of a treating physician's bias. *See Dixon*, 270 F.3d at 1177.

Labonne's arguments fail because, as the district court concluded, the ALJ reasonably found that Dr. Niazi's assessment was not impartial. Without explanation Dr. Niazi amended the disability onset date on Labonne's functional-capacity questionnaire from February 2005 to May 2004—the date Labonne insists she became disabled. But there is little evidence to support Dr. Niazi's choice of a May 2004 disability-onset date. It is true that Dr. Niazi reported in September 2004 that Labonne's heartbeat raced approximately three times a month and speculated that she had moderate cardiomegaly, as well as prominent pericardial effusion. But none of these conditions appear to be serious because at that time Dr. Niazi recommended no treatment, and indeed, as late as April 2005, Labonne reported to Nurse Asencio that her October 2004 EKG was normal. Furthermore Dr. Niazi suggested that symptoms of heart failure may have begun to appear as early as February 2005, but nothing in the record reflects his concern that symptoms manifested as early as May 2004. And as for Labonne's other illnesses, in May 2004 Labonne's anxiety and panic disorders were in remission and she did not seek treatment for back pain before November 2004, when the doctor recommended only that she wear a brace and exercise.

Labonne insists that the ALJ should have contacted Dr. Niazi to clarify why he moved up the onset date to May 2004. But as the government points out, Labonne never raised this argument to the district court, and has thus waived it on appeal. *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004).

Labonne also challenges the ALJ's adverse credibility finding. First she contends that the ALJ erroneously found that she had only modest functional limitation based on her testimony regarding her daily activities. She insists, to the contrary, that those activities were entirely consistent with her statement that she needs to lie down frequently.

However, the ALJ discredited Labonne's testimony not because of her account of her daily activities, but rather because of her improved ejection fraction. And that finding was reasonable. We uphold an ALJ's finding regarding the credibility of a claimant's reported limitations as long as the record provides some support for it. *Dixon*, 270 F.3d at 1178-79. Dr. Niazi's opinion that Labonne needed no treatment as long as her ejection fraction was normal substantiated the ALJ's conclusion that her improved ejection-fraction undermined her account of the extent of her limitations.

As for her second challenge to the ALJ's credibility finding, Labonne argues that the ALJ failed to consider whether her medications could have caused the fatigue she described. But an ALJ is not required to provide a complete written evaluation of each piece of evidence, *Rice*, 384 F.3d at 371, including the side effects of medication, *see Nelson v. Sec'y of Health and Human Servs.*, 770 F.2d 682, 685 (7th Cir. 1985). Aside from Labonne's testimony that her medications caused dizziness and drowsiness, the record contains virtually no evidence that she complained of her medications causing significant side effects.

Thirdly, Labonne argues that the ALJ impermissibly discredited her testimony regarding the effects of her depression and anxiety. But the ALJ reasonably concluded that her anxiety had only a limited effect on her capabilities because, after a May 2004 report that the anxiety was in remission, there is no record of her seeking treatment for a potentially disabling mental condition.

Finally Labonne argues that the ALJ's rejection of Nurse Asencio's assessment was not supported by substantial evidence. She insists that the ALJ "played doctor" by assuming, without medical evidence, that the degenerative-disk disease documented in her August 2005 MRI could not have caused the disabling pain that Nurse Asencio described. Indeed, she asserts, Dr. Maciolek's opinion, which the ALJ failed to mention, supported Asencio's assessment that her back pain precluded her from working. And even if her back pain could not account for all of her functional limitations, she adds, the ALJ failed to recognize that in Nurse Asencio's opinion the totality of her impairments caused her functional limitations.

An ALJ is required to examine the evidence favoring a claim as well as the evidence favoring its rejection. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). In addition the ALJ must assess the aggregate effects of a claimant's impairments. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). But the ALJ may credit a specialist over a treating source, particularly when the treating source has seen the claimant only infrequently. *See Hofslien*, 439 F.3d at 379.

The ALJ here was entitled to give little weight to Asencio's opinion because Asencio saw Labonne only twice, once for a cold and once for complaints of back pain; Asencio did not specialize in *any* of Labonne's impairments; and the specialists who did evaluate Labonne did not corroborate Asencio's opinion that Labonne's back pain was severe; none, including Dr. Maciolek, mentioned the possibility of treatments more aggressive than pain medication and exercise. Moreover the ALJ was not required to mention Dr. Maciolek's opinion in light of his reliance on the assessment of the state-agency physician (Dr. Lu) who discounted Dr. Maciolek's assessment as internally inconsistent and unsupported. As Dr. Lu observed, Dr. Maciolek's opinion that Labonne could not even perform sedentary work did not square with the normal gait, leg and arm strength, reflexes and straight leg raise test results that were documented during Dr. Maciolek's sole examination of Labonne. Dr. Chan subsequently affirmed Dr. Lu's assessment.

## Conclusion

The ALJ's decision was supported by substantial evidence and is not based on an erroneous application of law. The judgment of the district court supporting the ALJ's decision is **AFFIRMED**.