Willima A. MUNOZ, Plaintiff–Appellant,

v.

Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant–Appellee.

No. 02–1516.

United States Court of Appeals, Seventh Circuit.

Argued Aug. 6, 2002.

Decided Sept. 26, 2002.

Before POSNER, EASTERBROOK, and MANION, Circuit Judges.

**ORDER**

Willima Munoz applied for Social Security disability insurance benefits at the age of forty, alleging that she could no longer work because of back pain and numbness in her extremities caused by severe sco-

liosis. An administrative law judge concluded that Munoz was not disabled and denied benefits, and the Social Security Administration's Appeals Council denied review. Munoz then sought review in the district court, which upheld the agency's decision. We affirm.

## I. Background

Munoz was first diagnosed in 1986 with scoliosis, an abnormal curvature of the spine. It is undisputed that her scoliosis is pronounced; her spine curves 45 degrees to the right and also is slightly twisted. Not surprisingly she suffers from back pain and stiffness. In addition, she is 5 feet 3 inches tall and 211 pounds, and her left leg is an inch and a half shorter than her right, causing her to walk unsteadily. She uses a cane to help her balance. Nevertheless, Munoz has continued to work during the past fifteen years as a security guard, limousine driver, restaurant server, dispatcher, laundry worker, storage unit manager, warehouse worker, and most recently, as a housekeeper. Munoz says that she often missed work because of her back problems, and her frequent absences made it difficult for her to stay employed.

Munoz alleges that she became disabled on January 5, 1999, when she collapsed in the laundry room at her housekeeping job after bending down to pick up some linens. The next day while getting out of bed she felt a pinch in her lower back and both of her legs gave out. She went to the emergency room, where she was told to follow up with an orthopedist, which she did. The orthopedist, Dr. William Driehorst, noted that Munoz had "very limited" forward and backward bending, a bump in her back when she bent forward, and a 35–degree curve in her spine. Dr. Driehorst diagnosed Munoz as having "acute lumbar syndrome" and scoliosis, and prescribed pain medication. He examined Munoz

again a week later, and reported that although she still experienced stiffness when bending forward, her lower back pain had improved.

Munoz filed for disability benefits on February 11, 1999. The following month she returned to her housekeeping job but stopped working shortly thereafter because of back pain. In July Munoz saw another orthopedist, Dr. Deanna Willis, who noted that Munoz moved stiffly, had muscle tenderness, and experienced pain when bending forward. An x-ray showed a 45–degree curvature in Munoz's spine. Dr. Willis concluded that Munoz had "marked" upper and lower spine scoliosis, arthritis, and a "rotational spine deformity." She prescribed pain medication and referred Munoz to a physical therapist, whom Munoz began seeing in September 1999.

Several agency doctors also examined Munoz. In June 1999 Dr. Angel Ablog reported that Munoz's forward range of motion in her back was decreased and that although she could squat, she could not walk backwards and forwards in a squatting position. Dr. Ablog concluded that Munoz had a "15% scoliosis," "degenerative disease of the spine," and was obese. In September 1999 Munoz saw Dr. Mazen Alsati. Dr. Alsati reported that Munoz had difficulty standing up from a sitting position and getting on and off the examination table, had limited range of motion in her spine and hips, and used a cane. When he asked Munoz to walk without her cane, however, he observed that she was able to do so. Dr. Alsati recommended that an x-ray be taken to further evaluate the degree of Munoz's scoliosis and arthritis. The x-ray showed that Munoz had "severe dextroscoliosis" of the spine.

In mid–1999, another agency doctor, Dr. Rose Fife, assessed Munoz's residual functional capacity based on her medical file.

Dr. Fife presented her findings on form SSA–4734–BK, checking boxes to indicate her conclusions. Dr. Fife opined that Munoz was able to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk with normal breaks for a total of at least 2 hours in an 8–hour workday, sit for about 6 hours, and had unlimited pushing and pulling ability. In addition, she stated, Munoz could occasionally climb, balance, stoop, kneel, crouch, and crawl but should avoid slippery surfaces, extreme temperatures, and dangerous machinery. Dr. Fife's opinion was affirmed, without explanation, by another agency physician, Dr. Steven Roush.

The agency initially, and upon reconsideration, denied Munoz's application for benefits. Munoz then requested a hearing before an ALJ, at which Munoz appeared with counsel. Munoz testified that she could not sit or stand for more than 30 minutes at a time and could walk only one block without pain in her back and numbness in her legs. She stated that she also experienced shortness of breath and pain in her hands, wrists, knees, and hip joints, particularly in cold or rainy weather. She reported that she could not lift more than 10 pounds and experienced pain when lifting a gallon of milk. She was able to make dinner, wash dishes, and clean her home but testified that she did so slowly, resting every 30 minutes or so to alleviate muscle spasms in her back. She used an electric cart when grocery shopping and drove only occasionally.

Applying the familiar five-step analysis, see 20 C.F.R. § 416.920, the ALJ concluded that Munoz was not disabled for purposes of disability benefits. The ALJ found that Munoz satisfied the first two steps because she suffered from severe scoliosis and arthritis and had not engaged in substantial gainful activity since her onset date. But the ALJ concluded that her severe impairments did not meet or equal any impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, and thus she did not automatically qualify for benefits under the third step of the inquiry. The ALJ concluded that Munoz also failed at the fourth and fifth steps because, despite her impairments, she could perform her past relevant work as a security guard and dispatcher, and in any event, a significant number of other light and sedentary jobs available in the economy.

## II. Analysis

Munoz challenges the ALJ's findings at steps three, four, and five, primarily contending that the ALJ ignored medical evidence that she says demonstrates that her scoliosis was disabling. An ALJ, however, need not provide a complete written evaluation of every piece of evidence; rather, the ALJ must articulate, at some minimal level, his analysis of the evidence so that we can follow his reasoning. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). We will sustain the ALJ's findings so long as they are supported by substantial evidence and no error of law occurred. 42 U.S.C. § 405(g); *Dixon*, 270 F.3d at 1176. Substantial evidence requires no more than "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In reviewing the ALJ's decision, we may not reweigh the evidence or substitute our own judgment for that of the ALJ. *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir.2000); *Herron v. Shalala*, 19 F.3d 329, 332 (7th Cir.1994).

### A. Step Three: Listed Impairments

Munoz argues that the ALJ disregarded evidence at step three proving that her conditions met or equaled in severity several listed impairments—namely, Listing

1.03A, which concerns arthritis of a major weight-bearing joint, and Listings 1.05A and C, which concern arthritis and other spinal disorders. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.03, 1.05 (2001). The ALJ did not specifically discuss those three listings in his opinion, but he thoroughly recited the pertinent medical evidence supporting his conclusion that Munoz's conditions did not meet or equal any listed impairment.

■ Munoz first contends that she suffers from hip and ankle impairments satisfying the criteria of Listing 1.03A. To qualify under listing 1.03A, a claimant must have persistent joint pain, stiffness, and marked limited motion caused by arthritis of a major weight-bearing joint such as a hip or knee, along with x-ray evidence of a "gross anatomical deformity" that "markedly limit[s] ability to walk or stand." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.03 (2001). No doctor diagnosed Munoz as suffering from arthritis of her hip, knee, or any other major weight-bearing joint, and there is no x-ray evidence showing any gross anatomical deformity of those joints. Nonetheless, Munoz argues that the ALJ's decision is unsupported by substantial evidence because he ignored evidence showing that she had an ankle abnormality and limited range of motion in her hips.

The ALJ did not ignore this evidence, and, in any event, it does not support a finding that Munoz's ankle and hip problems were severe enough to satisfy the listing. The ALJ acknowledged Dr. Alsati's September 1999 report indicating that Munoz had a limited range of motion in her hips. Dr. Alsati's report, however, shows that the range of motion in Munoz's hips was diminished only slightly, at 90 degrees out of a normal 100, and thus does not establish a disability under the listing. The ALJ did not mention Munoz's ankle injury but did not err by failing to do so.

The 1993 ankle x-ray upon which Munoz relies merely showed some swelling and a "minimal irregularity" consistent with an old injury. Moreover, there are no recent medical evaluations of Munoz's ankle in the record. Substantial evidence therefore supports the conclusion that Munoz did not satisfy Listing 1.03A.

Munoz also argues that her obesity, when considered along with those impairments, rendered her disabled under Listing 1.03A because her ability to walk and stand was "markedly limited." Indeed, the record contains references to Munoz's height and weight, and one agency doctor explicitly described her as obese. We are mindful that an ALJ should consider at step three whether a claimant's weight problem had a disabling effect on her overall condition. *Clifford v. Apfel,* 227 F.3d 863, 873 (7th Cir.2000); Social Security Ruling 00–3p. Although the ALJ here did not discuss Munoz's weight problem, unlike *Clifford* the medical record was silent as to whether and how Munoz's obesity might have exacerbated her condition. Moreover, Munoz did not present any testimony or other evidence at her hearing that her obesity impaired her ability to work.

The ALJ did state generally that "all of the claimant's impairments have been considered both individually and in combination throughout the five step evaluation process." And, the ALJ's analysis adequately accounted for Munoz's various impairments, including her difficulties walking and standing. Contrary to Munoz's assertions, the ALJ acknowledged that Munoz's right leg was longer than her left, that she walked with a limp and used a cane, that she "waddled and swayed" when she walked, that her gait was sometimes "uncertain," and that she had difficulty standing up from a sitting position. The ALJ, however, reasoned that Munoz's doc-

tors observed that she had normal leg strength and that—despite her obesity—was able to walk without her cane, could tandem walk, could walk on her heels and toes with pain, and could squat. It is the ALJ's job, and not this court's, to weigh the evidence, resolve conflicts, and make findings of fact. *Powers,* 207 F.3d at 434–35. The medical evidence cited by the ALJ supports the conclusion that Munoz's ability to walk and stand was not "markedly limited," and thus Munoz does not qualify for benefits under Listing 1.03A.

Munoz next contends that she qualifies under Listing 1.05A or 1.05C because of her spinal arthritis and severe scoliosis. To satisfy Listing 1.05A, Munoz must present medical evidence showing the following:

A. Arthritis manifested by ankylosis or fixation of the cervical or dorsolumbar spine at 30 degrees or more of flexion measured from the neutral position,[1] with X-ray evidence of:

1. Calcification of the anterior and lateral ligaments; or

2. Bilateral ankylosis of the sacroiliac joints with abnormal apophyseal articulations.[2]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.05 (2001). Listing 1.05C, which governs "other vertebrogenic disorders," requires proof of the following:

1. Pain, muscle spasm, and significant limitation of motion in the spine; and

2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

*Id.* To support her claim under those listings, Munoz points to x-ray evidence showing the severity of her scoliosis as well as medical reports indicating that the range of motion in her spine was significantly limited and that she occasionally experienced radicular pain, numbness, and muscle spasms in her back. But the ALJ discussed such evidence in his opinion and accordingly found that Munoz suffered from severe scoliosis and severe mild arthritis. He did not, however, find that those conditions met or equaled the criteria of any listing and, we think, based on the evidence, he did so reasonably.

■ Although Munoz's evidence shows that she suffered from some of the listed criteria of 1.05A and C (i.e., significantly limited forward bending, back pain, and muscle spasms), a claimant must present medical findings that match or equal in severity *all* the criteria specified by the listing. *Sullivan v. Zebley,* 493 U.S. 521, 531, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Munoz has failed to do so. She did not present any x-ray evidence indicating that she had calcification, ankylosis, or abnormal apophyseal articulations in her spine, as required by Listing 1.05A. To the contrary, the x-ray from September 1999 upon which she relies showed a right convex scoliosis curve of 45 degrees but "no other bony abnormalities" indicative of arthritis. Likewise, the x-ray from March 2000 upon which the ALJ relied showed "severe dextroscoliosis of the thoracic spine" but no

1. "Ankylosis" is the "[s]tiffening or fixation of a joint as the result of a disease process with fibrous or bony union across the joint." *Stedman's Medical Dictionary* 90 (27th ed.2000). "Flexion" is "the bending of the spine so that the concavity of the curve looks forward." *Id.* at 686.

2. "Sacroiliac" is defined as "relating to the sacrum and the ilium." *Stedman's,* at 1587. The "sacrum" is "the segment of the vertebral column forming part of the pelvis." *Id.* at 1588. The "ilium" is "the broad, flaring portion of the hip bone." *Id.* at 875. An "apophyseal articulation" is a "bony outgrowth or projection" on a joint. *Id.* at 113, 152.

other "acute disease." With respect to Listing 1.05C, none of Munoz's doctors detected any muscle weakness, sensory loss, or reflex loss, which are essential criteria of Listing 1.05C. *See Pope v. Shalala*, 998 F.2d 473, 480 (7th Cir.1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir.1999). Indeed, as the ALJ stated in his analysis of the medical evidence, physical examinations showed that Munoz had negative straight leg raising (a positive result shows nerve root irritation), and normal muscle tone, strength, grip, and manipulative abilities. Furthermore, although Munoz complained of numbness in her extremities, her treating and consulting physicians consistently found that she had normal sensation and reflexes. Munoz points to no medical evidence that contradicts those findings. Thus, Munoz has not established that the ALJ's conclusion that she failed to qualify under Listings 1.05A or C was unsupported by substantial evidence.

## B. Step Four: Residual Functional Capacity to Perform Past Work

Munoz also challenges the ALJ's conclusion at step four that she retained the functional capacity to perform limited light and sedentary work, including her past jobs as a security guard and dispatcher. In particular, she asserts that the ALJ failed to compare the specific requirements of those jobs to her present capabilities. As with step three, at step four the ALJ could have provided a more detailed analysis of Munoz's past relevant work; nonetheless, we believe that the ALJ sufficiently articulated his reasons for his determination. An ALJ must at least build "an accurate and logical bridge from the evidence to [his] conclusion," *Dixon*, 270 F.3d at 1176, and he did so here. First, the ALJ found that Munoz retained the residual functional capacity to perform light work with certain restrictions. Second,

after determining Munoz's residual functional capacity, the ALJ accepted the VE's testimony that Munoz's past work as a security guard and dispatcher was light and sedentary respectively, and thus concluded that Munoz could perform those jobs.

■ Substantial evidence supports both of the ALJ's determinations. The ALJ's residual functional capacity finding is supported by Dr. Fife's assessment that Munoz could generally perform light work with some postural limitations and no concentrated exposure to extreme heat, cold, wetness, vibration, heights, and slippery surfaces. The record reflects that Dr. Fife considered Munoz's combined impairments, including her obesity. In support of her opinion, Dr. Fife pointed to Munoz's chronic lower back pain, her scoliosis, her height and weight, the disparity in her leg length, her limping gait, her reduced range of back motion, and the negative neurological findings. Notably, none of Munoz's treating or consulting physicians contradicted Dr. Fife's assessment of Munoz's residual functional capacity. Indeed, the ALJ noted, no work restrictions have been imposed by any treating physician. Moreover, Munoz, who had the burden of establishing that she could no longer perform her past work, *see Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir.1988), did not challenge the VE's testimony at the hearing regarding the physical demands of her security guard and dispatcher jobs. Nor does she now point to any specific requirements related to either of those positions that are inconsistent with the ALJ's residual functional capacity finding. In fact, the record reveals that Munoz performed such work (holding her dispatcher/limo driver position for three years) despite her severe scoliosis, which has existed since 1986. Thus, although we might reach a different conclusion than the ALJ regard-

ing Munoz's present capabilities, we cannot say that the ALJ's step four determination is unsupported by substantial evidence.

## C. Step Five: Availability of Other Work

Lastly, Munoz challenges the ALJ's step five determination that she also could perform other jobs, arguing that the ALJ ignored the VE's response to a hypothetical posed by her counsel. The ALJ concluded, based on the VE's testimony, that even if Munoz could not return to her past jobs, she could perform a significant number of other jobs in the economy. The VE was asked to evaluate a hypothetical individual of Munoz's age, education, and work experience who could perform light jobs with the limitations described above. The VE testified that a total of 40,000 cashier, office clerk, assembler, and inspector jobs would be available to such a person. As for the number of sedentary jobs available to a person with those same limitations, the VE testified that there were 17,000 such jobs available. Munoz's counsel then asked the VE to assume that, in addition to the limitations specified by the ALJ, the hypothetical individual was unable to sit or stand for more than 30 minutes at a time, walk for more than one half of one block, lift more than 10 pounds, bend without pain, walk without a cane, and work a full work week. The VE testified that an individual with those limitations would be unable to find gainful employment.

■ The ALJ disregarded that testimony because he did not find credible all of Munoz's allegations regarding her limitations, and we must defer to an ALJ's credibility determination unless the claimant can show that it was "patently wrong." *Powers,* 207 F.3d at 435. Munoz does not challenge the ALJ's credibility determination, and we find no reason disturb it. The ALJ did not fully credit Munoz's allega-

tions of disabling pain and weakness in part because her neurological examinations were "substantially normal," and she was able to "perform all physical testing" and had "no necessity for an assistive device." As discussed previously, *supra,* neither Munoz's treating physicians nor the agency doctors found any significant loss of strength, reflexes, or senses supporting Munoz's claims. Accordingly, the ALJ could have reasonably determined that her complaints were not entirely credible, *see Dixon,* 270 F.3d at 1178–79, and relied on the VE's testimony that a significant number of jobs existed accommodating Munoz's limitations to the extent that the ALJ found them supported by the medical evidence in the record. *See Ehrhart v. Sec'y of Health & Human Servs.,* 969 F.2d 534, 540 (7th Cir.1992).

## III. Conclusion

Because we are convinced that there is substantial evidence supporting the ALJ's decision at each step, we AFFIRM the judgment of the district court.