In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1307

LINDA GODBEY,

Plaintiff-Appellant,

v.

KENNETH S. APFEL, Commissioner
of Social Security,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 2690--William J. Hibbler, Judge.

Argued October 4, 2000--Decided December 15, 2000
Published March 21, 2001/*

Before MANION, EVANS, and WILLIAMS, Circuit Judges.

PER CURIAM.  In 1985 Linda Godbey was hospitalized
for major depression with psychotic features and
viral syndrome, which doctors diagnosed as
probable viral encephalitis or an acute
inflammation of the brain. More than ten years
later, Godbey applied for disability insurance
benefits ("DIB") from the Social Security
Administration ("SSA"), complaining that between
1985 and 1990 (the date she was last insured) she
experienced memory loss, psychotic episodes,
dementia, confusion and loss of concentration.
After a hearing before an administrative law
judge ("ALJ"), who denied her claim, the Appeals
Council denied Godbey's request for review. She
then filed a timely complaint in the district
court, and the district court affirmed the denial
of DIB. Godbey now appeals, arguing that the ALJ
failed to consider evidence in support of her
claim. We vacate and remand.

Background

On May 15, 1985, Godbey was admitted to Mercy
Center Hospital in Aurora, Illinois because she
was disoriented, confused and had a fever. She
was transferred on May 21 to the hospital's
psychiatric division, and was discharged on June
28. Dr. Richard Gallagher, who treated Godbey

during her stay in the psychiatric ward, composed a discharge summary upon her departure. In the summary, Dr. Gallagher discussed an abnormal electroencephalography ("EEG"), stating that "sharp waves now are seen on the . . . left temporal area . . . in addition to moderate to marked degree of slow wave abnormality seen on the left temporal area, indicating a significant neurophysiological disturbance within that region." Dr. Gallagher also reported that although Godbey had taken the medications Etrafon, Tylenol, Vistaril, Halcion and Haldol during her hospital stay, she did not take medication in the days before her discharge, and she was not prescribed medication upon discharge. He further stated that Godbey had "functioned well in the community while on therapeutic pass." Dr. Gallagher noted that Godbey was experiencing considerable stress arising from her loss of legal custody of her children, who at that time lived with her first husband, and the doctor scheduled a follow up appointment for a psychiatric consultation. In addition, Dr. Gallagher wrote that Godbey was advised to schedule an appointment with her primary attending physician. Dr. Gallagher's final diagnosis of Godbey was that she suffered from dementia, "[a]djustment reaction of adult life," and "[p]robable viral encephalitis." He concluded that her condition was, "[s]atisfactory-- improved, stabilized," and he noted that his final prognosis of her was "[g]ood."

Godbey did not keep her scheduled appointment with Dr. Gallagher. Further, the record does not reflect that she sought any medical treatment until eight years later, in 1993, when she went to an urgent care center to have a foreign object removed from her eye. She visited physicians several times after 1993 for routine examinations and for various ailments, but did not report any symptoms relating to her encephalitis until March 1, 1996. On that day, Godbey complained to her primary treating physician, Dr. Alan Haan, that she had been experiencing stress because her second husband was leaving her. Dr. Haan noted that her situation was complicated by the fact that she had an "[a]ltered mental status" deriving from her probable encephalitis in 1985. Dr. Haan concluded that Godbey was experiencing "[a]ltered mental status secondary to previous encephalitis," and referred her to a neurologist named Dr. Brian O'Shaughnessy for a disability evaluation.

Dr. O'Shaughnessy saw Godbey on March 6, 1996 and recorded Godbey's complaints of poor short-term memory, inability to drive because she would become lost and disoriented, forgetfulness, and confusion. According to the report, she also

claimed that she would forget to turn off the stove, would lose objects, and that her husband handled all of her finances. After reporting the results of his examination, Dr. O'Shaughnessy noted that "this patient has a moderate deficiency in her cognitive ability which is secondary to injury from encephalitis. Her biggest problems appear to be mainly in concentration and short-term memory but also in other intellectual functions such as ability to do arithmetic." He then stated that he did not believe she was employable due to her cognitive deficiencies. Further, he opined that Godbey was "in some danger of independent living. Sadly, I do not have any medication or treatment for her problem. I feel the prognosis for improvement in her mentation is 0 since she has not improved in ten years." Godbey filed for DIB on or about March 11, 1996. Her application and subsequent motion for reconsideration were denied.

Also in March 1996, the Illinois disability determination service (which makes disability determinations for SSA) contacted Dr. Gallagher to obtain further information about Godbey's hospitalization back in 1985. In this March 22, 1996 report, Dr. Gallagher generally repeated the findings of his 1985 report, but added that Godbey had experienced "dementia which was resolved as well as adjustment reaction of adult life and probable viral encephalitis." (emphasis added). He also concluded that he believed Godbey could perform "some work related activities such as understand[ing], carry[ing] out and remember[ing] instructions; and . . . respond[ing] appropriately to supervision, co-workers, and customary work pressures."

Godbey testified to her condition at a hearing before an ALJ. Godbey testified that she had worked as a word processor/secretary until 1985 (before her hospitalization), but stopped because her employer relocated to Arizona, and she did not want to move away. With regards to her medical complaints, Godbey stated that after her 1985 hospitalization, she could not recall past events and her "whole past was wiped out." She reported that she did not leave the house alone because if she walked further than a block or two from her home, she would become disoriented and lost. Godbey testified that her husband took care of her, adding that he even took away her car keys for fear that she would get lost and wreck the car.

Godbey's sister, Shirley Jaehrling, also appeared at the hearing, and testified that when Godbey returned from the hospital in 1985 "she was still not better" and "literally did not know she had children." When Jaehrling visited Godbey

on a weekly basis after her hospitalization, she found her to be "very disoriented for a long time . . . like she really wasn't aware of her surroundings." Jaehrling believed that Godbey's second husband was "domineering," but took care of her because Godbey "was very insecure about doing anything on her own." According to Jaehrling, Godbey's family was not aware that Godbey's "situation was so bad until her husband left her last year and he said I'm tired of taking care of her, she can't find her way around." Jaehrling further testified that Godbey now lived by herself, with a brother and a nephew living nearby.

After Godbey and Jaehrling testified, the ALJ ordered that additional neurological and psychological consulting evaluations be made. On June 24, 1997, Godbey received a neurological examination from Dr. Claude Hamilton, who concluded that Godbey's memory problems were "mild" although Godbey did appear to have a "mild decrease in her activities of daily living." He also observed that Godbey seemed to be capable of managing money in her own interest and that despite "some mild difficulty" with short-term memory, Godbey's "mini-mental status was unremarkable." Dr. Hamilton examined Godbey's exertional capabilities and reported that she was able to sit and stand without difficulty, could walk two blocks and could lift at least 20 pounds. Dr. Hamilton concluded that Godbey's prognosis was "stable" and opined that there would be "no further neurological improvement" at that time.

Godbey received two post-hearing psychological evaluations, one from William Hilger, Ph.D., and one from Dr. Kimberly Merenkov. Dr. Hilger concluded that Godbey was "a fairly intelligent woman who does not appear to have a serious memory disturbance as she has alleged." Although Dr. Hilger reported "some mild memory loss and confusion," he determined that Godbey had "very good vocabulary and conceptual reasoning skills, and a fair level of short term as well as long term memory." Objective personality testing showed Godbey to be a chronically depressed, anxious and dependent person "who was struggling to maintain independence and self-sufficiency." Nonetheless, Dr. Hilger believed that if Godbey received psychiatric treatment, she would have "good mental potential to pursue and maintain typical work related activities, follow instructions, and respond appropriately to co-workers, supervisors, and customers and work pressures."

Dr. Merenkov's report, on the other hand, painted a less optimistic picture of Godbey's

capabilities. In the "Medical Assessment of Ability to do Work-Related Activities (Mental)" form attached to Dr. Merenkov's report, Dr. Merenkov rated Godbey's ability to work in the majority of delineated categories as "fair" (meaning that the ability to function in that occupational area "is seriously limited, but not precluded"). With respect to the categories of dealing with work stress and personally and socially demonstrating reliability, Dr. Merenkov rated Godbey's ability as fair to "poor" ("poor" being defined as no "useful ability to function in this area"). Finally, Dr. Merenkov rated as poor Godbey's ability to understand, remember, and carry out detailed and complex job instructions. The doctor also concluded that based on Godbey's history, she may need assistance in managing her money. Yet, the doctor noted that Godbey's memory "appeared to be better during this mental status exam than what would have been expected per her history." Dr. Merenkov outlined the final diagnosis, finding that Godbey had a "[c]ognitive disorder not otherwise specified," as well as "[p]ersonality disorder not otherwise specified with dependent and narcissistic features." Dr. Merenkov then concluded that the prognosis was "very guarded for this claimant," and that Godbey "may benefit from a trial of individual psychotherapy to further clarify her actual cognitive deficits and possible need for psychotropic medication."

On October 29, 1997, the ALJ issued his decision, concluding that on and before December 31, 1990, Godbey had the residual functional capacity ("RFC") to perform her past relevant work as a clerical worker and thus was not disabled. The ALJ found Godbey's testimony to be credible "in certain respects," yet "not supportive of any disabling impairment." Based on the reports of Dr. Gallagher, Dr. Hamilton, Dr. Hilger, and Dr. Merenkov, the ALJ determined that the medical conditions resulting from Godbey's 1985 probable encephalitis had been resolved prior to her release from the hospital, and that Godbey was "well oriented with only mild memory impairments." In support of his determination that Godbey could perform light clerical work, the ALJ cited Dr. Hamilton's report that she could sit and stand without difficulty, could walk two blocks, and could lift at least 20 pounds. Also, the ALJ repeatedly stated that Godbey had not followed through with any psychiatric treatment after her 1985 hospitalization. Notably, the ALJ did not mention Dr. O'Shaughnessy's report, nor did the ALJ discuss Dr. Merenkov's conclusions doubting Godbey's ability to work. After the Appeals Council denied Godbey's request for review of the ALJ decision, Godbey filed a complaint in federal

district court. The district court affirmed the denial of DIB, concluding that substantial evidence supported the ALJ's determination that Godbey was not disabled on or before December 31, 1990.

Analysis

1. The ALJ's failure to consider important evidence in the record

On appeal, Godbey primarily argues that the ALJ failed to consider important evidence in the record that counters the ALJ's determination that she was not disabled. In reviewing an ALJ's decision that a social security claimant is not disabled, this court may not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." Clifford v. Apfel, No. 99-3831, slip op. at 10 (7th Cir. Sept. 14, 2000). Despite the deference accorded to the ALJ, in considering whether a decision to deny benefits is supported by substantial evidence, this court looks to see whether the ALJ built "a bridge from the evidence to his conclusion." Green v. Apfel, 204 F.3d 780, 781 (7th Cir. 2000). We believe that the ALJ's decision does not adequately consider evidence that supports Godbey's claim. Therefore, we are not certain that the ALJ sufficiently articulated why he rejected Godbey's evidence of disability. See Clifford, No. 99-3831, slip op. at 11.

a. Dr. Merenkov's Report

We first address Dr. Merenkov's report, which the ALJ selectively discussed; he does not address portions of that report which support Godbey's claim that she suffered cognitive and personality disorders. A complete review of the report reveals that Dr. Merenkov opined that Godbey had a cognitive disorder, a personality disorder, as well as a past history of psychotic symptoms, albeit from an unclear source. Furthermore, Dr. Merenkov determined that Godbey would be unable to understand, remember, and carry out complex and detailed job instructions, and that her ability to deal with work stresses and "demonstrate reliability" was between fair and poor. This report is significant because it diverges from Dr. Gallagher's and Dr. Hilger's conclusions that Godbey was psychologically capable of managing typical work activities. Perhaps the ALJ discounted Dr. Merenkov's analysis because the doctor characterized the conclusions as indecisive, admitted that the prognosis was "guarded," or because Dr. Merenkov believed that further clarification of Godbey's "actual cognitive deficits" was appropriate.

Nonetheless, the ALJ's failure to address Dr. Merenkov's report in its entirety prevents this court from tracking the ALJ's reasons for discounting it. See Clifford, No. 99-3831, slip op. at 13 (ALJ must consider "all relevant evidence" and may not analyze only that information supporting ALJ's final conclusion (emphasis in original)); Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995) (ALJ is required to articulate "his analysis of the evidence" so that appellate court may "track the ALJ's reasoning and be assured that the ALJ considered the important evidence"). While the ALJ need not articulate his reasons for rejecting every piece of evidence, he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position. See Green v. Shalala, 51 F.3d at 101. Here, the Commissioner admitted both in his brief and during oral argument that Dr. Merenkov's report is inconsistent with the conclusions of Dr. Hamilton, Dr. Hilger and Dr. Gallagher. The ALJ's decision, however, does not reflect that he resolved this evidentiary conflict. See Schmidt v. Apfel, 201 F.3d 970, 972 (7th Cir. 2000).

b. Dr. O'Shaughnessy's Report

Also troubling is the ALJ's failure to mention Dr. O'Shaughnessy's report. In the report, Dr. O'Shaughnessy opined that Godbey was suffering from a "moderate deficiency" in cognitive ability and was having problems with concentration, short-term memory and arithmetic. He also concluded that she was not employable and that it may be dangerous for her to live on her own. Lastly, he stated that her problems were not treatable and that her condition had not improved for ten years. As the Commissioner points out, there are many reasons why the ALJ could have disregarded Dr. O'Shaughnessy's report. For example, the doctor's opinion that Godbey's condition had not improved in ten years relies entirely on Godbey's allegations of the duration of her symptoms, and an ALJ may place less significance on a claimant's subjective complaints. See Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995). But this court cannot evaluate whether the ALJ properly rejected this evidence in favor of the other doctors' reports, or even ensure that the ALJ examined this report, unless the ALJ explains his reasoning. See Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).

c. Evidence regarding Godbey's failure to seek medical treatment after 1985

In denying Godbey's DIB application, the ALJ repeatedly states that Godbey had not sought medical treatment for her claimed disability for

almost ten years. Godbey, however, argues that the ALJ failed to consider evidence that justified her failure to seek medical treatment. The record contains considerable evidence that Godbey depended heavily on the assistance of others, both emotionally and with respect to her mobility. Her sister testified that Godbey's second husband was domineering and took care of Godbey's affairs. Godbey also testified that she would not leave her immediate neighborhood without the company of either her former husband, her sister, or another relative. Additionally, Dr. Merenkov's report included Godbey's allegation that she did not see a doctor after her hospitalization because she could not find the doctor's office on her own, and because the medicines were not improving her memory or making her feel better. Dr. Merenkov concluded that Godbey suffered from a personality disorder with dependent and narcissistic features. Although this evidence of Godbey's severe dependence on others may explain why she did not seek medical treatment after her hospitalization, the ALJ did not address any of this information.

To the extent that the ALJ based his decision to deny benefits on Godbey's failure to follow through with prescribed medical or psychiatric treatment, the record demonstrates another significant conflict in the evidence which the ALJ did not adequately resolve. On the one hand, Dr. Gallagher reported in his discharge summary that he had not prescribed any medication upon Godbey's departure from the hospital, but had scheduled Godbey for a psychiatric consultation. Godbey never followed through with Dr. Gallagher's prescribed treatment of psychiatric therapy, and under SSA regulations, to obtain benefits a claimant "must follow treatment prescribed by [the claimant's] physician if this treatment can restore [the] ability to work," 20 C.F.R. sec. 404.1530(a). Furthermore, the fact that Dr. Gallagher did not prescribe medication upon Godbey's discharge supports the ALJ's conclusion that Godbey's problems relating to the probable encephalitis had resolved when she left the hospital in 1985, and that psychiatric treatment would have assisted her with her lingering problems relating to stress management. Finally, Dr. Hamilton concluded that with psychiatric treatment, Godbey would be able to return to work, and Dr. Merenkov opined that further psychiatric evaluation would be helpful.

On the other hand, the fact that Godbey was not prescribed medication upon her discharge from the hospital also supports the opposite conclusion: that there was no medication or treatment available to alleviate Godbey's problems resulting from her probable encephalitis. Dr.

O'Shaughnessy's observations that he did not have any medication or treatment for her symptoms, and that his "prognosis for improvement in her mentation is 0 since she has not improved in ten years" contradicts the determination that prescribed therapy would enable Godbey to return to work. As stated before, the ALJ does not discuss O'Shaugnessy's report, and an ALJ must explain the reasoning for rejecting evidence, see Clifford, No. 99-3831, slip op. at 15. Because the ALJ did not discuss the competing evidence regarding Godbey's reasons for not seeking medical attention, it is not possible for us to discern whether the ALJ adequately considered all of the evidence.

d. Godbey's and Jaehrling's testimony regarding Godbey's condition after her discharge  from the hospital

   Godbey additionally argues that the ALJ erred in disregarding testimony given by her and her sister about Godbey's memory problems and other post-hospitalization mental difficulties. This testimony is relevant to the question of whether Godbey was disabled between 1985 and 1990, because it is the only evidence, besides Dr. Gallagher's discharge summary, contemporaneous with Godbey's condition at that time. But again, it is not clear from the ALJ's decision that he rejected or considered Godbey's or Jaehrling's testimony about Godbey's ability to function between 1985 and 1990. The fact that Godbey's and Jaehrling's testimony are lay opinions, as opposed to medical diagnoses, regarding Godbey's alleged mental disorder does not matter. With respect to lay opinions about the existence of depression, this court held in Wilder v. Apfel, 153 F.3d 799, 802 (7th Cir. 1998), that "[w]hat is required is contemporaneous corroboration of the mental illness . . . not necessarily contemporaneous medical corroboration."

e. Godbey's 1985 EEG readings

   The ALJ also failed to address abnormal EEG readings that were taken before Godbey left the hospital in 1985. In the 1985 discharge summary, Dr. Gallagher noted that the EEG reading showed "marked to moderate degree of slow wave abnormality . . . indicating a significant neurophysiological disturbance within that region." The report, however, does not explain whether this EEG reading is important or if it reflects on Godbey's ability to function mentally. The abnormal EEG reading could be considered contemporaneous evidence of a medical impairment that had not resolved at the time of her discharge from the hospital, thus corroborating both Godbey's and Jaehrling's

testimony, as well as the retrospective reports of Dr. Merenkov and Dr. O'Shaughnessy. Or the EEG report could mean nothing at all. But because the ALJ's decision does not discuss the EEG findings, we can not be sure that the ALJ examined this evidence or rejected it as insignificant.

## 2. The absence of a "standard document"

Finally, Godbey argues that the decision should be reversed because the ALJ did not complete a standard document that is required in all cases involving mental disorders. But under revised regulations that took effect on September 20, 2000, the ALJ is no longer required to complete the standard document. See Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50774-50775 (August 21, 2000) (to be codified at 20 C.F.R. sec. 404.1520a). Therefore, we need not remand the case so that the ALJ can compile the standard document and attach it to his decision.

## Conclusion

Because the ALJ's decision failed to address significant evidence in the record, we vacate the district court's decision with instructions to remand this case to the Commissioner for further proceedings consistent with this decision.

VACATED and REMANDED.


/* Although our original disposition of this case was by an unpublished order under Circuit Rule 53, we have subsequently granted a motion to reissue this decision as a published opinion.