**Marylu GROSKREUTZ,**
**Plaintiff–Appellant,**

**v.**

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant–Appellee.**

**No. 03–3666.**

United States Court of Appeals,
Seventh Circuit.

Argued July 7, 2004.

Decided Aug. 26, 2004.

Marcie E. Goldbloom, Daley, Debofsky & Bryant, Chicago, IL, for Plaintiff–Appellant.

Marc Mates, Chicago, IL, for Defendant–Appellee.

Before CUDAHY, COFFEY, and ROVNER, Circuit Judges.

## ORDER

Marylu Groskreutz in her application for disability insurance benefits alleges that she is disabled because of fibromyalgia, shoulder pain, diabetes, and mental impairments. An ALJ found that although Groskreutz has severe impairments, she could still perform her past relevant work, and therefore, was not disabled. After the Appeals Council denied review, Groskreutz sought review of the Commissioner of Social Security's final decision in district court. The district judge adopted the magistrate judge's report and recommendation and affirmed the denial of benefits. We vacate and remand for further proceedings.

## I. BACKGROUND

Groskreutz, who is 45 years old and has a 10th grade education, worked as a special education assistant. On February 3, 1999, a special needs student, whom Groskreutz was leading into school, struck her in the back several times with his school bag. Once inside the school, the student slammed Groskreutz into lockers, injuring her left shoulder and upper back. While recuperating from that injury, Groskreutz continued to report for work and performed light duty work such as photocopying and answering phones. Groskreutz continued to experience escalating pain and was eventually diagnosed with fibromyalgia, and because she was no longer able to work as a special education assistant, her employer requested her resignation effective June 8, 2000.

### A. Evidence of Physical and Mental Impairments

Groskreutz promptly sought medical treatment for pain after the incident with the special-needs student. A physician assistant diagnosed muscle strain and prescribed a non-steroidal, anti-inflammatory

drug ("NSAID"). Then, after seeking chiropractic care for the next month, Groskreutz visited Dr. Patrick Sura, a family practitioner, complaining of back and shoulder pain and sleep problems. Dr. Sura observed mild spasms, trigger points, and tenderness in Groskreutz's shoulders and back. He prescribed an NSAID for inflammation, a muscle relaxant for the spasms, and physical therapy. He also restricted her to a four hour work day with "light duty restrictions with ability to stretch."

From April 1999 to June 2000, Groskreutz repeatedly sought treatment for her recurrent pain from Dr. Sura and Dr. Lynn Quenemoen, a specialist in occupational medicine. Groskreutz continually complained of tingling and numbness in her left arm and muscle spasms; she also complained of abnormal sensations in her left fingertips, sleep disturbances, total body pain, and "knots" in her back. Although Groskreutz admitted that her symptoms "wax[ed] and wane[d]," her symptoms, she said, were aggravated by prolonged standing, lifting, and her return to a normal work load. Drs. Sura and Quenemoen repeatedly observed tenderness and trigger points in her neck, shoulders, and back. They prescribed cortisone injections, anti-inflammatory medication, muscle relaxants, pain killers, physical therapy, and the use of a Theracane, a tool used to massage trigger points; they also recommended that Groskreutz continue her light-duty work restrictions. After physical therapy reduced her pain somewhat, she was discharged with instructions to continue her physical therapy program at home.

Unable to account for Groskreutz's lack of improvement, Dr. Quenemoen referred her to specialists. A rheumatologist diagnosed Groskreutz with fibromyalgia based on the presence of multiple trigger points.

He counseled her on a treatment plan consisting of medication for her sleep problems, an NSAID for pain, and exercise, stressing that she would have pain "no matter what." Two orthopedists opined that Groskreutz's shoulder pain was caused by tendinosis and chronic musculoskeletal pain, and thus, was not amenable to surgery.

After leaving her job in June 2000, Groskreutz continued to seek treatment from Dr. Sura for her fibromyalgia and chronic pain. During spring 2001 Dr. Sura diagnosed her with diabetes, which required her to monitor her diet and take medication to control her sugar levels.

Groskreutz first experienced anxiety and depression in 1995, and her symptoms resurfaced after her injury, which led her to seek treatment again. Beginning in February 1999, she saw psychiatrist Robert Nesheim approximately every three to six months for monitoring of the prescribed medication she was taking for anxiety and depression. Initially, Dr. Nesheim noted that Groskreutz's anxiety was under control. But as time passed, he adjusted her medications when she complained of recurring "mild panic-like episodes" and difficulties concentrating. By November 2001, Dr. Nesheim noted that her prognosis regarding her anxiety and depression was "extremely guarded."

B. Groskreutz's Daily Activities

At her disability hearing, Groskreutz described her impairments and how they affected her daily activities. She testified that she had pain down her arm into her fingers, neck, and back and that she had "spasms all the time"; and she took medication for her pain, anxiety, depression, and diabetes. Before the pain started, Groskreutz said, she used to be able to walk two-and-a-half miles but the pain now limited her to five to six blocks. Gros-

kreutz further explained that the pain prevented her from "do[ing] anything," causing her to gain about 60 pounds. Pain also disrupted her sleep: after a couple hours of sleep, she would wake up in pain and with spasms and could fall back to sleep only after walking around for a little while. She could grocery shop and do chores only with significant help from family members or frequent rest periods. Furthermore, she was unable to read because of concentration problems related to her pain.

## C. The ALJ's Decision

Applying the standard five-step analysis, *see* 20 C.F.R. § 416.920, the ALJ somehow determined that Groskreutz was not disabled. First, the ALJ found that Groskreutz had not engaged in substantial gainful employment since the alleged onset date of her injury on June 8, 2000. Second, relying on a medical expert's testimony, he determined that she was severely impaired by fibromyalgia, diabetes, left shoulder tendinopathy, combined with depression and anxiety. Third, the ALJ found that Groskreutz's impairments did not meet any of the listed impairments. Before proceeding to the fourth step, he determined that Groskreutz retained the residual functional capacity ("RFC") for light exertional work with limited overhead work and no repetitive pushing or pulling with the left arm. He also found her limited to "unskilled work with brief and superficial contacts with the public and her co-workers." And as to step four, agreeing with the vocational expert's ("VE") testimony, the ALJ concluded that Groskreutz could perform her past relevant work.

## II. ANALYSIS

We review de novo the district court's entry of judgment in favor of the Commissioner, *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001), and will uphold the Commissioner's decision so long as the ALJ applied the correct legal standard and substantial evidence supported the decision, *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir.2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir.2003) (internal quotation omitted). The issue on appeal is whether substantial evidence supports the ALJ's finding at step four that Groskreutz could perform her past relevant work.

## A. Karas' Report

■ Groskreutz argues that the ALJ failed to discuss a report prepared by vocational evaluator Tom Karas that supported her subjective complaints of pain and her doctor's work limitations. Because the ALJ discredited her subjective complaints and work limitations, she argues, he should have analyzed the report. In the report, Karas opined that based on his personal observations over several days of testing in October 2001, Groskreutz's "chances for success at full time employment, at a competitive pace, on a consistent basis, are predicted to be poor." Karas further noted in the report that he observed Groskreutz "grimacing, holding her left shoulder with her right hand and [having] difficulty concentrating." He also recorded in his observations that she frequently—every five to ten minutes—requested to change her position, whether from sitting to standing, or vice versa. According to Karas, when she stood, she leaned on her chair for support, and she required breaks during testing so she could walk around.

Although an ALJ need not discuss every piece of evidence, he must confront significant evidence that conflicts with his decision. *Indoranto v. Barnhart*, 374 F.3d

470, 474 (7th Cir.2004); *Books v. Chater*, 91 F.3d 972, 980 (7th Cir.1996); *Diaz v. Chater*, 55 F.3d 300, 307–08 (7th Cir.1995). This court requires an ALJ to explain why he rejected a piece of evidence; otherwise, this court cannot determine whether the ALJ properly rejected the evidence, or even considered it all. *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir.2001). Here, Karas' report goes to the heart of Groskreutz's disability claim—whether she could sit and stand long enough to perform light work—and therefore, conflicts with the ALJ's finding that she has the residual functional capacity for light work. And contrary to the Commissioner's claim that the vocational expert's report is based on subjective complaints and second-hand information, the report does include direct observations from a neutral evaluator. The ALJ should have discussed Karas' report, at a minimum explaining why it was not relevant, and his failure to do so is a legal error warranting remand. *See id.* (remanding when the ALJ failed to discuss a doctor's report that conflicted with the ALJ's determination that the claimant was not disabled).

B. Groskreutz's Credibility

■ Next, Groskreutz generally argues that the ALJ erred in finding that she was not credible, explaining that a "multitude of errors" prevents this court from upholding the ALJ's credibility determination and his reliance on this determination to discount the opinions of her treating doctors. The ALJ relied on the following reasons when he found her not credible:

1. "Objective findings" did not support her subjective complaints of pain to the extent alleged.
2. The record lacked evidence of spasms to the extent she claimed.
3. Her testimony that she could not have shoulder surgery because of her fibromyalgia was not consistent with the record.
4. Her daily activities were not fully consistent with her subjective complaints of pain.
5. Her current complaints of left leg pain and lower back pain were not supported by the medical evidence.
6. Mental status findings did not support her subjective complaints of concentration deficits.
7. She engaged in "symptom magnification" when she claimed that she gained significant weight because of her pain.
8. Her report of weight gain was "mutually exclusive" of maintaining a diabetic diet.
9. She failed to undergo group therapy despite her doctor's recommendation.

Because the ALJ is best positioned to determine a witness's credibility, we will not overturn a credibility determination unless it is "patently wrong." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir.2003). We will affirm a credibility determination as long as the ALJ's reasons are supported by the record. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir.2001). But we will reverse when an ALJ's decision "is unreliable because of serious mistakes or omissions." *Sarchet v. Chater*, 78 F.3d 305, 308 (7th Cir.1996); *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (noting that remand is appropriate when the ALJ "based his credibility determination on serious errors in reasoning rather than merely the demeanor of the witness").

Groskreutz's first and most persuasive argument challenging the ALJ's credibility determination is that the ALJ ignored objective and subjective evidence of her fibromyalgia. The ALJ noted that Gros-

kreutz has fibromyalgia and suffers from trigger-point tenderness, but he discounted this evidence because her doctors did not observe muscle atrophy or deficiencies in mobility. This reasoning suffers from two flaws. First, the ALJ overemphasized the significance of muscle atrophy and mobility deficits; for instance, nowhere does he cite medical evidence to substantiate his belief that Groskreutz must exhibit these symptoms. *See Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir.2003) (stating that an ALJ improperly "play[s] doctor" when she makes a medical conclusion without expert evidence). Second, the ALJ displayed a fundamental misunderstanding of fibromyalgia. As this court has recognized, fibromyalgia is a "common, but elusive and mysterious" disease frequently undetectable by laboratory tests. *Sarchet*, 78 F.3d at 306. Doctors diagnose the disease by locating at least 11 tender spots from 18 fixed locations throughout the body; once diagnosed, sufferers can also expect to experience "pain all over," fatigue, and disturbed sleep. *Id.* Since no fewer than three of Groskreutz's doctors identified trigger points sufficient to support a fibromyalgia diagnosis, the ALJ was required to determine whether her symptoms—including total body pain, inability to complete chores without breaks, and sleep problems—were consistent with fibromyalgia. S.S.R. 96–7p at 2; *see Indoranto*, 374 F.3d at 474–75. The ALJ failed to do so.

Next, Groskreutz argues that the ALJ ignored medical evidence that she did in fact suffer from spasms. Although the ALJ noted that doctors observed that she had suffered spasms, he later asserted that the record does not contain evidence of spasms to the extent she alleged. From our point of view upon review of the ALJ's opinion, the ALJ seemed to read and analyze the record in a selective manner; on at least three occasions, Groskreutz's ex-amining doctors observed spasms that were sufficiently serious to warrant muscle relaxants being prescribed. *See Godbey*, 238 F.3d at 808 (holding that an ALJ may not selectively discuss evidence).

Groskreutz further argues that the ALJ incorrectly found an inconsistency where there was none between her doctor's explanation and her explanation for why she could not have shoulder surgery. According to Groskreutz's doctor, surgery would not have been helpful because there was no lesion to repair. The ALJ determined that this explanation was inconsistent with Groskreutz's testimony that she could not have surgery "because of her fibromyalgia." But as Groskreutz explains in her brief, what she actually meant by her testimony was that her pain was caused by her fibromyalgia, and therefore, shoulder surgery would not have relieved her pain. She attributes the lack of precision in her testimony to her limited education, and we agree that the apparent inconsistency noted by the ALJ can be explained by her imprecise response. *See Sarchet*, 78 F.3d at 308 (explaining that the claimant's minimal education accounted for a discrepancy between her testimony and the medical evidence).

Finally, Groskreutz argues that the ALJ overstated her ability to perform her daily activities when he found that her activities were not consistent with her subjective complaints of pain. The ALJ noted that she could shop and do chores, but he ignored that she required assistance from her children when she went shopping and did laundry and that she took frequent rest breaks while vacuuming or cooking. This court has repeatedly recognized that a claimant's ability to perform limited and sporadic tasks does not mean she is capable of full-time employment. *E.g., Carradine*, 360 F.3d at 755; *Clifford v. Apfel*,

227 F.3d 863, 872 (7th Cir.2000); *Shramek v. Apfel,* 226 F.3d 809, 813 (7th Cir.2000).

The Commissioner urges that alternative grounds exist for affirming the ALJ's credibility determination, but each reason cited by the Commissioner is problematic. First, the ALJ found that Groskreutz's complaints of leg and back pain were not credible because she denied this type of pain on three occasions; the ALJ, however, failed to consider that her symptoms "wax[ed] and wane[d]" and that she complained of total body pain on other occasions. Second, the ALJ stated that Groskreutz's claim that she could not concentrate because of her depression and anxiety was not supported by the record; in fact, however, she claimed that her pain, which is supported by medical evidence of her fibromyalgia, interfered with her concentration. Third, the ALJ found that Groskreutz engaged in "symptom magnification" regarding her weight gain, and therefore, was not credible; but, because she did gain 20 pounds over two years, her testimony is still credible. *See Carradine,* 360 F.3d at 754 (explaining that whether a claimant's symptom is more acute is a different question from whether the claimant experiences the symptom at all). Fourth, the ALJ stated that Groskreutz's weight gain was inconsistent with her maintaining a diabetic diet; yet her weight gain occurred before she was diagnosed with diabetes and began a diet that enabled her to lose weight. *Green v. Apfel,* 204 F.3d 780, 782 (7th Cir.2000) (explaining that the ALJ erred when he failed to consider alternative explanations for an apparent inconsistency). Finally, the ALJ deemed significant the fact that Groskreutz failed to seek prescribed group therapy treatment for her depression and anxiety; but this reason has nothing to do with the credibility of Groskreutz's testimony regarding her pain. *See Herron v. Shala-*

*la,* 19 F.3d 329, 336 (7th Cir.1994) (holding that a claimant's claim regarding whether he could work in an air-conditioned environment did not "reflect[ ] on the credibility of his entire testimony"). The ALJ's credibility determination is not supported by the record and thus is patently wrong.

## C. Dr. Sura's Opinion Regarding Groskreutz's Work Limitations

■ Groskreutz also challenges the ALJ's decision to discount Dr. Sura's opinion, which if credited, would preclude her from working. Dr. Sura opined that as of August 2001 Groskreutz could frequently lift less than 10 pounds and occasionally lift 10 pounds and may have to miss work more than four days a month because of her impairments, although he noted that the number of work days missed "cannot be estimated."

A treating doctor's opinion regarding the nature and severity of a medical impairment is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Gudgel,* 345 F.3d at 470. An ALJ may discount a medical opinion that is internally inconsistent as long as he "minimally articulate[s] his reasons for ... rejecting evidence of a disability." *Clifford,* 227 F.3d at 871.

The ALJ erroneously disregarded Dr. Sura's opinion regarding how much weight Groskreutz could lift and how many days of work she may have to miss. The ALJ apparently concluded that Groskreutz could lift 20 pounds and would not miss any work. Regarding the weight restriction, the ALJ stated that he disregarded Dr. Sura's 10–pound lifting restriction, and corresponding sedentary work limitation, because of the absence of "reflex, sensa-

tion or motor loss symptoms," but, he did not explain why the absence of "reflex, sensation or motor loss symptoms" meant that she could lift more than 10 pounds. Absent a medical opinion explaining why "reflex, sensation, or motor loss symptoms" were significant, the ALJ's reason for discrediting Dr. Sura's lifting limitations is not supported by the record. *See Blakes,* 331 F.3d at 570 (explaining that an ALJ should solicit a medical expert's opinion before concluding that a doctor's opinion was inconsistent with the medical evidence).

Regarding how many work days Groskreutz might have to miss, the ALJ found Dr. Sura's opinion internally inconsistent. The ALJ thought that Dr. Sura's statement that Groskreutz may have to miss more than four days of work per month conflicted with his statement that the number of days missed "cannot be estimated." But Dr. Sura's statements are in fact consistent: he opined that Groskreutz would miss more than four days of work a month but that the exact number of days over four could not be estimated.

## CONCLUSION

Because we remand for a new hearing, we do not reach Groskreutz's arguments regarding the mental limitations contained in the ALJ's RFC finding and discrepancies in the vocational expert's testimony. We REVERSE the judgment of the district court and REMAND the case for further proceedings consistent with this opinion.