UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 24, 2006
Decided March 30, 2006

**Before**

Hon. KENNETH F. RIPPLE, *Circuit Judge*

Hon. ILANA DIAMOND ROVNER, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

No. 05-1689

| | |
|---|---|
| THELMA L. ANDERSON,<br>       *Plaintiff-Appellant,*<br><br>   *v.*<br><br>JO ANNE B. BARNHART,<br>       *Defendant-Appellee.* | Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division<br><br>No. 1:03CV1202 LJM<br><br>Larry J. McKinney,<br>*Chief Judge.* |

**ORDER**

Thelma Anderson appeals from an order upholding a determination by the Commissioner of Social Security that she is not entitled to disability benefits. Anderson attended special education classes from the third grade until she quit school in the ninth grade while pregnant. She was working as a custodian for Indiana University when she applied for Supplemental Security Income in April 2000. Anderson describes herself as a "slow learner" who cannot read or write, and claims that mental retardation along with back and knee pain prevent her from working.

An Administrative Law Judge ("ALJ") conducted a hearing after the Social Security Administration ("SSA") denied benefits initially and on reconsideration. The evidence was mostly documentary and largely undisputed. From the time she

left school until 1991, when she was 26, Anderson's only significant employment was a summer job as a general laborer at an apartment project. That year, for reasons not disclosed in the record, the Disability Determination Division of the Indiana Department of Human Services asked psychologist Herbert Henry to interview Anderson and administer an intelligence test. Anderson told Dr. Henry she could dress herself, attend to personal hygiene, and perform simple household chores but couldn't shop for groceries alone because she cannot write or count money. Anderson scored a verbal IQ of 64, a performance IQ of 71, and a full-scale IQ of 66. Dr. Henry concluded that Anderson's full-scale score suggested mild retardation, but he declined to make that diagnosis because her level of functioning seemed "adequate" except for activities involving reading and writing.

In 1993, when Anderson was 28, psychologist Paul Martin evaluated her intelligence and vocational potential. As before, the reasons for the assessment are not disclosed. Anderson told Dr. Martin that, except for her summer job at the apartment project, she had worked only briefly as a bakery cashier. Anderson described her health as generally "good" except for pain and swelling in her left knee that had lingered after surgery to repair torn ligaments. Anderson was generally friendly during the evaluation, but Dr. Martin found her interpersonal style "subdued and hesitant." He also noted that it was better to address her using simple language even though her speech was clear and easily understood. Dr. Martin concluded that Anderson's presentation and interpersonal manner did not present a vocational disadvantage, but recommended that she avoid jobs requiring interpersonal assertiveness such as sales, teaching, or management. Anderson scored a verbal IQ of 64, a performance IQ of 69, and an overall IQ of 65, which Dr. Martin equated with mild mental retardation. He recommended remedial training in math and reading but acknowledged that the process would likely be "slow and difficult." He also suggested Anderson would profit from hands-on job training and with help from a job coach could succeed in unskilled, "competitive"[1] work. Anderson, though, apparently received no training and did not work again until she started as a custodian at the university in January 1999.

Meanwhile, in January 1994, Anderson was injured in a car accident. The emergency room physician diagnosed her with neck and back sprains and prescribed nonsteroidal, anti-inflammatory medications for the pain. He also recommended that she not lift more than ten pounds for a week. Anderson injured her back again in November 1999 while hauling trash as part of her custodian job. She attended physical therapy for several weeks and was prescribed medication for her pain.

---

[1] We assume this was a typo and was meant to be "repetitive" work.

In January 2000, after the work injury, Anderson first sought treatment from Dr. Ralph Buschbacher.  She complained of constant pain and occasional burning and tingling around her left shoulder, but Dr. Buschbacher did not think she appeared that uncomfortable despite scoring her pain as a "10 out of 10."  After noting normal ranges of motion in her back and neck, Dr. Buschbacher ordered an electromyogram (EMG) that ruled out spinal nerve disease and recommended a corticosteriod injection, which Anderson refused.  He then recommended physical therapy and suggested work restrictions.

At a follow-up exam the same month, Anderson reported feeling "quite a bit better."  A week later she announced the improvement had been only temporary, but Dr. Buschbacher noted she had failed to attend physical therapy as directed and, anyway, her exam was largely unremarkable.  When Anderson described her symptoms as unchanged in late February 2000, Dr. Buschbacher ordered spinal x-rays that proved unremarkable, restricted her from bending at work, and recommended a lumbosacral corset to improve her posture.  He further restricted her to "sit down" work in early March after she admitted having ignored his previous restrictions to continue performing her normal job duties.  He remarked that her pain had been "unresponsive to treatment" but opined that with two more weeks of physical therapy she could be discharged with permanent restrictions.

Two months later in March 2000, Dr. Buschbacher found Anderson's condition largely unchanged but detected moderate signs of "inappropriate illness behavior and some inconsistencies."[2]  He concluded that she was only 5% impaired and discharged her with "permanent restrictions in the light to medium physical demand level of duty."  Anderson told Dr. Buschbacher she lost her job because she could not perform the same functions, but it is unclear which job she lost or when she lost it; Anderson reported working at three different jobs between January 1999 and February 2001 (one as a custodian and two as a housekeeper at hotels), but did not specify precise employment dates.

In February 2001, after she had applied for SSI, Anderson started a new custodian job.  On September 26, 2001, about a week before she filed her application for DIB, Anderson was seen by Nurse Practitioner Mary Blanchet.  Anderson complained of a two-week history of left shoulder pain and discomfort in her left knee, and Blanchet noted tenderness in her left shoulder area and some crepitus[3] in

---

[2]  Inappropriate or maladaptive illness behavior is a term used by doctors to describe patients who report pain without sufficient physical cause.

[3]  Crepitus is defined as "the grating of a joint, often in association with

(continued...)

her knee. An MRI revealed mild chondromalacia[4] in Anderson's knee, but no problems in her shoulder. Blanchet prescribed ibuprofen and told Anderson to not work for the next 24 hours.

On October 4, 2001, the day she applied for DIB, Anderson saw Dr. L.T. Gates and complained of a two-year history of pain. He prescribed medication and ordered an EMG of her left shoulder area. Two weeks later, when Anderson returned to see Nurse Practitioner Blanchet, she acknowledged missing her EMG appointment but said her pain was "greatly improved" with the new medication. Because Anderson had often mentioned that her custodian job contributed to her pain, Blanchet suggested she seek other employment. Anderson responded, however, that her illiteracy restricted her employment opportunities.

In November 2001, on request of the SSA, Dr. Chamoun Chamoun examined Anderson and noted nothing remarkable other than decreased forward flexion of her dorsolumbar spine and left hip. After evaluating Anderson's September 2001 MRI, Dr. Chamoun discerned no reason for her reported pain, and suspected she might have "fibromyalgia or a malingering syndrome."[5]

Dr. John McLimore examined Anderson in January 2002 after she filed a worker's compensation claim for a September 2001 injury. She vaguely complained of "ill-defined" pain in her left shoulder area, but her exam was "objectively normal" except for maladaptive illness behaviors. For instance, Dr. McLimore noted that Anderson's "profound" pain was reduced or extinguished entirely when she was unaware she was being tested; where she could not lift her left arm without reporting pain during active testing, she was able to raise it over her head without difficulty or any sign of pain when distracted. Dr. McLimore changed her medication and prescribed a two- to four-week conditioning program along with tentative work restrictions limiting her from lifting more than 20 pounds.

In April 2002 Dr. F. Montoya reviewed Anderson's medical record at the SSA's request. He concluded that her pain allegations exceeded medical findings and that the evidence did not reveal a severe impairment. In June 2002 Dr. J.

---

[3](...continued)
osteoarthritis." *Stedman's Medical Dictionary* 424 (27th ed. 2000).

[4] Chondromalacia is defined as "[s]oftening of any cartilage." *Stedman's Medical Dictionary* 341 (27th ed. 2000).

[5] Fibromyalgia is defined as a "syndrome of chronic pain of musculoskeletal origin but uncertain cause."

Pressner conducted a similar review at the SSA's request and concluded that because her functional level was much higher than her IQ scores would suggest, she did not need "extraordinary accommodations" to perform "simple, repetitive tasks on a sustained basis."

In September 2002 Anderson visited a hospital emergency room complaining of intermittent back pain as well as neck pain and tension headaches. The attending physician, Dr. John Sidle, diagnosed her with muscle strain, prescribed medication and physical therapy, and recommended light duties at work for one week. Anderson began physical therapy but was discharged after two weeks for failing to attend. In late October 2002 she returned for follow-up with Dr. Sidle, who continued her medication and imposed work restrictions of decreased lifting for three months.

During her February 2003 hearing before the ALJ, Anderson testified she was fired from her most recent job in 2001 because she could not "lift as much" after sustaining a back injury. She said she could not do her job because she could stand for only 10 minutes, had trouble bending, and was in constant pain, especially when lifting more than five pounds. Anderson also stated she was regularly on medication that was only sometimes effective. With regard to the pain in her knee, Anderson testified that she could sometimes walk up to a half mile, but that she tried to stay off her knee whenever possible. She also stated she tried physical therapy three times and was told her injury was permanent and would not improve. A typical day, she said, was spent lying down; if she needed to go out, her boyfriend would take her. Anderson also told the ALJ she attended special education classes, left school in the eighth or ninth grade, and was unable to read and write.

The ALJ rejected Anderson's claim using the standard five-step analysis. *See* 20 C.F.R. §§ 404.1505(a), 416.905(a); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). At Steps One and Two, the ALJ concluded that Anderson had not engaged in substantial gainful activity since her alleged February 2001 onset date, and that she had "'severe' impairments consisting of chronic pain syndrome and borderline intellectual functioning." But at Step Three the ALJ determined that her impairments, either alone or in combination, failed to meet or exceed the level of severity of any listed impairment. *See* 20 C.F.R. Part 404, Subpart P, App. 1. At Step Four, the ALJ concluded that Anderson was still able to perform work requiring no more than light exertion, which included her past relevant work as a hotel maid. Overall, however, the ALJ questioned Anderson's credibility and cited examples in the record indicating that her subjective complaints about the severity of her impairments were "not reasonably consistent with the objective medical and other evidence of record."

We will uphold the ALJ's factual findings so long as they are supported by substantial evidence and not undermined by legal error. 42 U.S.C. § 405(g)*; Dixon*, 270 F.3d at 1176. Substantial evidence is evidence a reasonable mind could accept as adequate to support the ALJ's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ's decision need not address every piece of evidence or testimony, but must provide a "logical bridge" between the evidence and his conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). We will not reweigh the evidence or substitute our own judgment for that of the ALJ. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).

Anderson argues that there is insufficient evidence supporting the ALJ's adverse credibility determination and the finding she could return to her job as a hotel maid. She also attacks the ALJ's finding that her mental and physical impairments did not meet the requirements of Listing 12.05C, which states:

> 12.05 Mental Retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

According to Anderson, the ALJ failed to address Listing 12.05C and "ignored all of the evidence" that would prove she had a "physical or other mental impairment" that rendered her disabled under Listing 12.05C. To the contrary, the ALJ specifically discussed whether Anderson's evidence met the requirements of Listing 12.05, noting disagreement between her two evaluating psychologists as to whether she was mentally retarded. To resolve this conflict, the ALJ considered both Dr. Pressner's opinion that Anderson suffered only from borderline intellectual functioning as well as her work history, which the ALJ observed stood "in stark contrast to the deficits in adaptive functioning required for a diagnosis of even mild mental retardation." But even after agreeing with the finding that Anderson was not mentally retarded, the ALJ gave her the benefit of the doubt: "I will conclude

that she functions in the borderline range of intellectual functioning, and limit her to work which requires no more than minimal reading, writing or arithmetic."

Given the ALJ's ultimate conclusion, nothing is gained by arguing Anderson's IQ scores render her mentally retarded. Even she admits that a score between 60 and 70 is not sufficient to meet Listing 12.05; she was also required to show that she suffered from a physical or other mental impairment which imposed "an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. Anderson argues that the evidence she provided regarding her back and shoulder pain met this burden. She points to several excerpts from the record where she claims the ALJ ignored or failed to credit her evidence. It appears, however, that Anderson is the one selectively considering the evidence, not the ALJ. For example, Anderson cites Nurse Blanchet's report noting Anderson's own complaints of pain in her knee and shoulder but fails to recognize that Blanchet ultimately found Anderson's musculoskeletal exam benign. She also relies on physical therapy notes describing her as having rounded shoulders and shoulder pain, but she omits mention that this initial assessment is incomplete because she attended only one therapy session.

The cases Anderson cites to support her argument than an ALJ may not selectively consider the evidence are distinguishable. *See, e.g., Clifford*, 227 F.3d at 870 (reversing because ALJ disregarded treating physician's opinion that claimant had arthritis without citing any conflicting evidence in the record); *Godbey v. Apfel*, 238 F.3d 803, 807-10 (7th Cir. 2000) (vacating and remanding because ALJ's failure to address significant evidence in the record prevented meaningful appellate review); *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) (reversing because treating physician's failure to order x-rays was insufficient basis on which ALJ could conclude claimant did not have arthritis). Here, rather than focusing on isolated comments taken out of context, the ALJ's decision reflects an analysis of the evidence as a whole. After noting some inconsistencies in the medical evidence, the ALJ conducted a thorough analysis into Anderson's pain allegations. First, the ALJ remarked that, despite exam results showing tenderness and pain to palpation, the record did not reveal any "significant or persistent musculoskeletal or neurologic deficits." He also noted that, although Anderson reported that physical therapy did not help her, she also did not attend all of her sessions as prescribed. Furthermore, the ALJ observed that none of Anderson's MRIs, EMGs, or x-rays suggested anything remarkable about her condition, which led him to question the credibility of her claims. So long as an ALJ's credibility determinations are supported by the record, they will be accorded "special deference." *Sienkiewicz v. Barhart*, 409 F.3d 798, 803 (7th Cir. 2005). Here, at least three reports support the ALJ's skepticism; Dr. Buschbacher observed that Anderson did not appear to be in as much pain as she claimed, Dr. McLimore noted that her pain almost completely disappeared

when she did not realize she was being tested, and Dr. Chamoun suggested a "malingering syndrome" when he found nothing on her MRI to explain her pain.

Given that the ALJ thoroughly considered Anderson's complaints of pain, we also reject her argument that the ALJ's decision does not comport with Social Security Ruling 96-7, which requires an ALJ to provide "specific reasons" for a credibility determination and not simply state that "the individual's allegations have been considered" or that "the allegations are credible." SSR 96-7p. Here again, the cases Anderson cites to support this argument are distinguishable. *See, e.g., Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003) (finding that ALJ failed to comply with Ruling 96-7 because his decision contained no reasons why he found the claimant's testimony unbelievable); *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 540 (7th Cir. 2003) (same).

Finally, Anderson argues that the ALJ's determination that she could perform her previous duties as a hotel maid is not supported by substantial evidence. This argument also fails. After noting that the United States Department of Labor categorizes the job of hotel maid as one requiring only light exertion and no more than minimal reading, writing, and math skills, the ALJ again examined the record to determine whether Anderson was capable of light exertion. Despite her various doctor visits, the only work restrictions on record since her reported onset date were for light-duty work for one week and a temporary restriction that she lift no more than 20 pounds occasionally. Thus, substantial evidence supports the ALJ's conclusion that despite her educational and physical limitations she is not disabled and is capable of working as a hotel maid as that job is customarily performed in the national economy.

AFFIRMED.